**Betty Lou BEETS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69583.**

Court of Criminal Appeals of Texas, En Banc.

Nov. 12, 1987.

Rehearing Granted Feb. 17, 1988.

On Rehearing Sept. 21, 1988.

Rehearing Denied Jan. 25, 1989.

Gilbert M. Hargrave, E. Ray Andrews, Athens, for appellant.

Billy M. Bandy, Dist. Atty., Athens, Robert Huttash, State's Atty., Matthew W. Paul, Asst., and Carl E.F. Dally, Sp. Asst. Pros. Atty., Austin, for the State.

## OPINION

TEAGUE, Judge.

Betty Lou Beets, the appellant, was convicted by a jury of committing the offense of capital murder of Jimmy Don Beets, who was then her lawful husband. It was alleged in the indictment that the appellant "did then and there, knowingly and intentionally cause[d] the death of an individual, namely, Jimmy Don Beets, by shooting him with a firearm, and the said murder was committed for remuneration and the promise of remuneration, namely: money from the proceeds of retirement benefits from the employment of Jimmy Don Beets with the City of Dallas, insurance policies on the said Jimmy Don Beets in which the [appellant] is the named beneficiary, and the estate of Jimmy Don Beets."[1] After the jury found appellant guilty of the offense of

---

1. The record reflects that Beets died intestate. See *post*. At the time of his death, Beets and appellant had been married less than one year, although they had previously lived together for an unknown period of time.

capital murder, "as alleged in the indictment",[2] it thereafter answered in the affirmative the special issues that were submitted to it pursuant to Art. 37.071, V.A.C.C.P.[3] Neither the appellant nor the State presented any testimony or evidence at the punishment stage of the trial; the State relying upon the evidence that had been presented at the guilt stage of the trial as the basis for the jury's answers to the special issues that were submitted at the punishment stage of the trial. Thereafter, the trial judge assessed the appellant's punishment at death. We reverse.

Appellant presents to us for review nine (9) "points of error," which comports with the new Texas Rules of Appellate Procedure, effective September 1, 1986. However, given the fact that notice of appeal occurred in this cause prior to September 1, 1986, her contentions should have been phrased as "grounds of error" and not "points of error." Therefore, we will review the contentions as "grounds of error" and not as "points of error." See and cf. *Burdine v. State,* 719 S.W.2d 309 (Tex.Cr.App., 1986). They are as follows: "(1) The first count of the indictment is deficient in that it does not allege every constituent element of the offense; (2) No evidence was offered to sustain the charge of murder for remuneration; (3) The trial court erred in admitting evidence that the accused had shot and killed another former husband, Doyle Wayne Barker; (4) There was insufficient evidence for a conviction of Capital Murder as the prosecution relied on accomplice testimony to prove both elements of the crime and said accomplice testimony was not supported by other evidence tending to prove the elements of the crime of Capital Murder; (5) It was error for the Trial Court not to grant the [appellant's] Motion for Change of Venue as it

was clear from the evidence presented at the hearing of the motion that such a prejudice existed against the [appellant] in the community that a fair trial was precluded; (6) Alternatively, if it was not error for the Trial Court to grant the change of venue at the time of the hearing, it was error for the Trial Court to conduct the voir dire in the manner that it did; (7) It was error for the Trial Court not to grant a change of venue at the end of voir dire as the evidence gleaned from the examination of the potential jurors further supported the claim of the defendant that a fair trial could not be heard in Henderson County; (8) It was error for the Court not to grant the defendant's Motion for Mistrial after testimony revealed that the witnesses had been discussing their testimony with each other during the trial; (9) The prosecution's actions in subpoenaing approximately 90 witnesses while using only 20 deprived defendant of her right to effective counsel."

We will only review and decide appellant's grounds of error numbered 1, 2, and 4.

Because appellant challenges the sufficiency of the evidence in her grounds of error numbered 2 and 4, see *ante,* and because a challenge to the sufficiency of the evidence must be considered by this Court even if the conviction is reversed for an unrelated reason or reasons, see *Selman v. State,* 663 S.W.2d 838 (Tex.Cr.App. 1984), we will first briefly highlight what we believe to be the more salient material facts of this cause that go to the appellant's guilt.[4]

Lil Smith, owner of the Redwood Beach Marina, which is located between the communities of Kemp and Seven Points or between the communities of Seven Points and

---

**2.** The indictment obviously alleges the offense of murder and the aggravating element of remuneration, which causes the offense of murder to be elevated to capital murder. *See, however, post.*

**3.** The special issues were as follows: "Was the conduct of the Defendant, Betty Lou Beets, that caused the death of the deceased, Jimmy Don Beets, committed deliberately and with the reasonable expectation that the death of the de-

ceased or another would result?"; "Is there a probability that the Defendant, Betty Lou Beets, would commit criminal acts of violence that would constitute a continuing threat to society?"

**4.** Although the State presented no evidence at the punishment stage of the trial, appellant makes no challenge on appeal to the sufficiency of the evidence to sustain the jury's answers to the special issues.

Gun Barrel City on Cedar Creek Lake or Reservoir, testified that around 10:00 o'clock p.m. on August 6, 1983, several of her customers at the marina noticed an empty boat drifting on the lake near the marina. Two of her customers went and got the empty boat and brought it to shore. Found inside the boat was a fishing license with the name "Jimmy Don Beets" thereon.[5] The Coast Guard and Parks and Wildlife were notified and several of their personnel came to the marina. Smith then looked in the telephone book to see if anyone by the name of Jimmy Don Beets was listed, found that name, telephoned the listed number several times, and finally spoke to appellant and informed her about the empty boat and the finding of Beets' fishing license.[6] The appellant went to the marina and identified the boat and the fishing license as belonging to Beets, who was then her lawful husband.[7] Because of high winds, it was decided by the authorities that a search for Beets' body would not commence until the next morning, August 7th.

Johnny Marr, a deputy sheriff for Henderson County, testified that at approximately 8:30 o'clock a.m. on August 7th, he and Hugh G. De Woody, the Fire Chief of the Payne Spring Fire Department, went to the appellant's residence to see if Beets had possibly returned home since he had been reported missing. Appellant told Marr that her husband "had went fishing the night before [on the lake and 'had been having trouble with his boat'], and hadn't returned Saturday morning." Marr told appellant that as speed boat races were taking place on the lake that day, and because of the numerous boats that would

be in the lake that day, it was likely that Beets' body would be found by someone. When appellant testified, she denied that Marr and De Woody came to her residence that morning.

Mike Warren of the Parks and Wildlife Department testified that extensive search efforts were made by members of several different fire departments, which included members of the City of Dallas Fire Department, for whom Beets had been employed for approximately 26 years, members of the Henderson County Sheriff's Department, Coast Guard personnel, and many other persons. Although the search lasted for three weeks, Beets' body was never recovered.

Denny Burris, a chaplain with the City of Dallas Fire Department, testified that he visited with appellant several times after Beets was reported missing. Burris testified that appellant made inquiry of him whether she was covered by any insurance policies that Beets might have had with the City of Dallas, as well as inquiring whether she would be entitled to receive any pension benefits that Beets might have accumulated. Appellant did not profess to Burris that she had any specific knowledge of either insurance coverage on Beets' life or any pension benefits Beets might have accumulated. Burris told her that he did not know but would check into the matter and report back to her. Burris did check and learned that Beets's life was insured with the total amount of insurance being approximately $110,000. He also learned that appellant would be entitled to receive approximately $1,200 each month from Beets' pension benefits. Burris advised appellant of his findings, and also told her

---

5. Also found in the boat were a medicine bottle containing nitroglycerine tablets and a life jacket. Several tablets from the bottle were found in the bottom of the boat.

6. The appellant later told Smith that the reason she did not immediately answer the telephone was because she was outside in the yard and did not hear it ring.

7. The boat was established to be Beets' separate property, having been acquired before he and appellant married. On July 24, 1984, almost a year after Beets was reported missing, but be-

fore the skeletal remains of his body were found, appellant sold the boat to Martha and Michael J. Miller. During the trial, Martha testified to the facts of the sale of the boat by appellant to her and her husband. The record also reflects that Beets owned a house, which was also apparently his separate property. Appellant testified that she and Beets had tried to sell the house before Beets disappeared. The house mysteriously burned. Apparently, after letters testamentary issued, appellant, through counsel, unsuccessfully attempted to recover on a fire insurance policy that insured the house for fire loss.

that according to the City Attorney of Dallas that because Beets' body had not been recovered there would be a seven year waiting period before any payment of insurance proceeds could occur.[8]

Rick Rose, an investigator for the Henderson County Sheriff's Department, testified that he became directly involved in this case almost two years after Beets' had disappeared. His direct involvement in the case occurred after "[he] received information from a [credible] confidential informant who gave [him] facts that there may be possible ... questions [concerning the cause of the death] of Jimmy Don Beets." This occurred sometime in the spring of 1985. At that time, neither Beets' body nor the physical remains of his body had been found. As a result of Rose's investigation, he secured an arrest warrant for the appellant that charged her with the murder of Beets. Rose had her arrested on June 8, 1985 by members of the Mansfield Police Department, who turned her over to Rose, who booked her into the Henderson County Jail. The validity of the arrest warrant, which is not in the record of appeal, was not challenged in the trial court nor is it challenged on appeal in this Court. Rose testified that after appellant was incarcerated he went and secured "an evidentiary search warrant" to search the appellant's residence and its premises. The validity of the search warrant, which is also not in the record, was not challenged in the trial court nor is it challenged on

appeal in this Court. Pursuant to the execution of the search warrant, physical remains of the bodies of Beets and Doyle Wayne Barker, another former husband of appellant's, were found at different locations on the premises where the appellant and Beets were living at the time Beets disappeared.[9] Beets' remains were found buried in the "wishing well," [10] which was located in the front yard of the residence. Barker's remains were found buried under a storage shed located in the backyard of the residence. Two bullets were recovered from Beets' remains. The remains of the two bodies were transported to the Dallas Forensic Science Laboratory where they were subsequently identified as being the remains of the bodies of Beets and Barker. A Collector's item pistol that had been previously recovered from the appellant's residence as a result of an incident that did not involve the appellant and was not directly related to the cause at Bar was also turned over to the Dallas laboratory.

Robert "Robbie" Franklin Branson, II, one of appellant's sons, who we will hereinafter refer to as Robbie, testified. The trial judge later instructed the jury that Robbie was, as a matter of law, an accomplice witness to the Beets' killing. Robbie, who was then on felony probation for committing a burglary that had occurred in Navarro County, which is unrelated to this case, testified that he was living with appellant and Beets on August 6, 1983, when

**8.** Evidence was adduced during the trial which established that approximately two years later, the appellant, through an attorney, applied for and received letters testamentary. At the same time, appellant, through the attorney, applied to have Beets legally declared dead. On March 5, 1985, approximately three months before the skeletal remains of Beets' body were found and identified, Beets was legally declared dead by the presiding judge of the County Court of Henderson County. Appellant was made the administratix of Beets' estate. These proceedings appear proper under the provisions of Section 72 of the Probate Code. That section also provides that "Distribution of the estate to the persons entitled thereto shall not be made by the personal representative until after the expiration of three (3) years from the date such letters [testamentary] are granted." However, on April 4, 1985, the attorney for Beets' only natural child, James Donald Beets, filed a mo-

tion for new trial in that cause. On June 10, 1985, two days after appellant was arrested on June 8, 1985, the presiding judge of the County Court of Henderson County issued an "Order for Protection." At the time of trial, the issue of who would ultimately administer Beets' estate, as well as who would ultimately financially benefit from his estate, had not been resolved. By the probate records, Beets died intestate.

**9.** The jury was not then made aware of the extraneous offense testimony regarding Barker's disappearance and death. This came into evidence after the trial judge conducted a hearing on appellant's motion to exclude such testimony, which he overruled. See *post.*

**10.** A "wishing well" is one of those objects supposed to be capable of magically conferring the fulfillment of one's wishes. *The Compact Edition of the Oxford English Dictionary* at 3796.

appellant falsely reported Beets missing; that appellant told him that she was going to kill Beets that evening; that Robbie then left the residence at the suggestion of appellant, because "she said she wanted me to leave and she didn't want me to be around when she shot and killed him," and remained absent for approximately two hours, after which he returned to the residence when he learned that his mother had actually shot and killed Beets during his absence. Robbie thereafter assisted appellant in placing Beets' body in the "wishing well", which he and Beets had previously constructed. The next day, after appellant put some of Beets' heart pills in the boat that Beets owned and after Robbie took the propeller off the boat, Robbie took the boat to the main part of the lake, abandoned it, and was soon met by appellant near that location. The two then returned home. During cross-examination, the appellant's attorney several times accused Robbie of being the actual killer of Beets, which Robbie denied. Robbie admitted that his participation with appellant in burying Beet's body in the "wishing well" had preyed on his conscience. However, except for telling his ex-common-law wife who did not testify, Robbie remained silent on the subject for almost two years. Robbie testified that he remained silent because he wanted "to protect his mother." However, after his mother was arrested, Robbie commenced cooperating with the authorities, "to protect his back[side]." Robbie testified that he knew of Barker, but had only seen him one time, and that he did not live with his mother and Barker when she and Barker were married and lived together.

Shirley Stegner, one of appellant's daughters and a sister of Robbie, also testified for the prosecution. Shirley testified that her mother telephoned her on the night of August 6th and requested that Shirley come to her residence, which Shirley did. During the telephone conversation, Shirley asked her mother "if she had done what we had talked about before," which conversation related to appellant previously telling Shirley that she was going to kill Beets, put Beets' body in the boat, have Robbie take the boat out into the lake,

where he would drop Beets' body into the lake, and then set the boat adrift, so that it would look like Beets had accidentally drowned. Appellant responded: "Yes." Shirley went to her mother's residence but after she got there appellant informed her that "everything was taken care of and that I could go back home," which she did. Shirley testified that several weeks later she returned to her mother's residence when she was informed by appellant that "her and my brother Robbie had buried Jimmy Don Beets in the wishing well." Shirley never testified that appellant had admitted to her that she had killed Beets in order to recover on any insurance policies or to receive any pension benefits that Beets might have had.

At this time during the trial, the trial judge conducted a hearing on the appellant's motion to exclude any extraneous offense testimony going to the death of Barker, after which the trial judge overruled the motion, thus permitting the State to then present testimony going to the disappearance and death of Barker. See, however, *post.*

In the presence of the jury, Shirley testified that in October, 1981, almost two years before Beets disappeared, when her mother and Barker were married and living together, while she and her mother were "sitting around a campfire", her mother told her that "she was going to kill Doyle Wayne Barker" because "she couldn't put up with anymore of him beating her and that she didn't want him around anymore." Her mother also told her that "the trailer [house] was in his name and she was just a co-signer on it and that if they were to get a divorce, that he would end up with the trailer [house]." Approximately 3 or 4 days later, at Shirley's residence, Shirley and her mother had another conversation, during which her mother told her that "it was all over with and she had done what she intended to do ... She told [Shirley] that she waited until [Barker] went to sleep and then she got the gun and covered it with a pillow and pulled the trigger and when she pulled the trigger, the pillow [interfered] with the firing pin, so she hesi-

tated for a minute, afraid that Wayne was going to wake up, and she cocked the gun again and fired and shot him in the head." Thereafter, Shirley assisted her mother in disposing of Barker's body: "We drug him from the trailer outside to the back and put him in the hole that had already been dug [in order to build a barbeque pit]." Shirley further testified that "the next day [she and her mother] went and bought some cinder blocks and [built] a patio" over the hole in which Barker's body had been placed. Subsequently, a large storage shed replaced the patio. During cross-examination, Shirley testified that although she had also been charged with the murder of Barker and her $1,000,000 bail bond had been reduced to $5,000 she had not been promised anything by the prosecution in exchange for her testimony against her mother. We pause to point out that in the conversations that Shirley had with her mother regarding Barker's death, other than the reference to the trailer house, appellant did not admit to Shirley that she was going to kill Barker for financial gain. There is also no evidence whatsoever in the record that might reflect or indicate that appellant financially benefited from Barker's death. There is also no evidence in the record that might reflect or indicate that the trailer house to which appellant referred and the trailer house in which appellant and Beets resided when Beets was reported missing are one and the same trailer house.

Rick Rose was recalled to testify. Rose testified to the recovery of the skeletal or physical remains of Beets and Barker's bodies. See *ante*. The remains were transported to the Dallas Forensic Science Laboratory where they were subsequently identified as being the skeletal or physical remains of Beets and Barker's bodies.

Dr. Charles S. Petty, the Chief Medical Examiner and Director of the Dallas County Forensic Science Laboratory, testified to the "post-mortem autopsy" that he performed on the skeletal remains that had been sent to the laboratory. Petty testified that he identified the bones as those of Beets and Barker's bodies. Petty testified that the cause of death of Beets was "the gunshot wound defect in the skull and locating of not one but two bullets, one in the region of the skull and the other in the region of the bones of the trunk. In my opinion, death was due to one, if not two, gunshot wounds ... One in the head and one in the trunk somewhere." Two bullets were recovered from the skeletal remains of Beets' body; one from the skull area of the body and one from the trunk area of the body.[11] Petty also testified that the bullets found in Beets' skeletal remains could have been fired from the same weapon, but he was unable to positively testify that they were fired from the Collector's item pistol. Three bullets were recovered from the skeletal remains of Barker's body. Petty testified that the cause of Barker's death was "gunshot wounds."

Allen Jones, a firearms examiner employed by the Dallas County Forensic Science Laboratory, testified that he examined the recovered bullets, after which he formed the opinion that they were fired from a .38 calibre type weapon, which was the calibre of the Collector's item pistol. Jones, however, was unable to positively testify that in his opinion the bullets that were fired came from the Collector's item pistol that had been previously recovered from the appellant's residence. See *ante*.

Jackie Collins, a niece of Beets who was also an employee of J.C. Penney Life Insurance Company, testified to Beets' personally cancelling an insurance policy in the amount of $10,000 on May 19, 1983. The application, which had apparently been sent with a monthly J.C. Penney bill to either Beets or appellant or to both of them, had been filled out without Beets' knowledge. What attracted Collins' attention to the application was the fact that the address on the application was not Beets' but was that of another of appellant's daughters. Ap-

---

11. Dr. Randall L. Callison, who had been Beets' dentist during his lifetime, testified that he made a comparison of Beets' skeletal remains with x-rays that he had and in his opinion "the bodily remains that were presented to me from the Dallas County Medical Examiners were the remains of Jimmy Don Beets."

pellant was the named beneficiary on the application. When appellant testified, she did not deny that she had filled out the application, signed Beets' name to the application, and returned it with the monthly payment.

Peggy Sherrills Webb, an employee of the City of Dallas who was a "Benefits Supervisor with Personnel", testified that Beets had a life insurance policy with the City in the amount of $86,000, with the appellant the named beneficiary of the policy.

George Chaney, a documents examiner who had been employed for 23 years by the Secret Service and was presently employed by James Leroy Lewis and Associates, documents examiners located in Dallas, testified that the signature on the J.C. Penney's application, "J.D. Beets", was signed by appellant, but that the signature "J.D. Beets," that authorized the policy to be cancelled, was Beets' actual signature. Chaney also testified that the signature on the certificate of transfer or bill of sale for the boat, "J.D. Beets", which occurred when the boat was sold to the Mitchells, was signed by appellant. This, however, occurred on July 24, 1984, almost one year after Beets had disappeared. When appellant testified, she did not dispute the fact that she had sold the boat to the Mitchells nor did she dispute that she signed Beets' name to the bill of sale.

Jerry Hast, an employee of the City of Dallas, who was the "Administrator of the Dallas Police and Fire Pension Fund", testified concerning an application for benefits that had been filed by an attorney on behalf of appellant, which occurred after the letters testamentary had issued. Hast testified that "The Pension Board" voted to approve a settlement with appellant for pension benefits. This settlement was going to be finalized on June 10, 1985. Hast also testified that the settlement was cancelled after members of the Board learned that appellant had been arrested for murdering Beets. The appellant would have received $15,852.59 plus a monthly benefit of $790.42 for the rest of her life or until

she remarried had the settlement been finalized. Whether the $15,852.59 referred to any insurance policies is not reflected in the record on appeal. As previously pointed out, our Probate Code prohibits distribution of a missing person's estate until three years from the date the letters testamentary issued have expired.

E. Stewart Elrich, Jr., Manager of the Group Life Claims Department of Republic National Life Group Insurance Company, testified that his company had issued a life insurance policy on Beets' life in the amount of $23,428. The policy also contained an accidental death provision in the amount of $20,000. At some time, presumably after March 5, 1985 when the letters testamentary issued, an attorney wrote the company on behalf of appellant stating that "an application had been made for administration of an estate." No action was ever taken on the attorney's letter.

At this time during the trial the State rested. Hon. Billy Bandy, the prosecuting attorney, soon thereafter stated into the record that he rested when he did because "I always wait until it's—the mood strikes me and then I rest ... [T]he way things went, I decided to just shut it down [when I did]." Counsel for appellant then stated: "You think it's going that good, huh?" Bandy did not verbally respond to counsel's question. From remarks in the record, we can infer that when the State rested when it did that this may have caught appellant's counsel by surprise.[11A] The careful trial judge, however, informed appellant's counsel that he would give him whatever time he might need before proceeding, but counsel declined the offer: "No, I don't need anymore time. I'll be here at nine in the morning", and counsel did appear as promised.

The appellant first had Faye Lane, another of her daughters, testify. Lane testified that neither Robbie nor Shirley ever mentioned to her that their mother admitted to them that she had killed Beets or Barker or participated in burying them after they had been killed. Lane also testified that

**11A.** See appellant's ground of error marked 9, *ante.*

"everything that [Robbie has] ever told her, [she] believed."

Raymond Bone, who lived with appellant after Beets' disappeared, testified. Bone testified that he entered into an agreement with law enforcement officials, in particular Rose, that he would keep them posted at all times as to the whereabouts of appellant, and he did. It is obvious to us from the testimony that was adduced, as it must have been to the jury, that before appellant was arrested Bone had notified the authorities where she would then be located. Why Rose and Henderson County authorities, rather than Mansfield authorities, did not arrest appellant when she was arrested is not clear from the record. Bone testified that he did not believe that appellant was guilty of killing Beets, which conclusion was based upon the following: "I lived with her and ... she always treated me decent." There is no evidence in the record that appellant ever attempted to kill Bone or made arrangements for his disappearance. Bone's financial condition, which appears to have been lacking, was not directly brought out at trial.

Bobby Wayne Branson, another son of the appellant, who we will refer to as "Bobby", testified that before Beets disappeared, Robbie, his brother, and Beets had a "couple" of arguments and fights over various and sundry things, several of which occurred after Beets, appellant, Bobby, and a friend of Bobby's had taken a vacation trip to Virginia where they visited with appellant's mother and father and her relatives. The vacation trip occurred just "a couple of weeks" before Beets disappeared, and from everyone who testified that was familiar with the trip it appears to have been a happy trip. There was also testimony that before Beets and appellant lawfully married in 1982 the two of them took a trip to Virginia to attend appellant's brother's funeral. Bobby also testified that when his mother and Barker were married and living together he lived with them "part of the time." Bobby further testified that when he noticed that Barker was no longer to be seen around the house, he asked his mother where he had gone. She replied: "[H]e was just gone ... he left."

Appellant herself testified. In reference to the killing of Beets, her former husband to whom she had been lawfully married less than one year, appellant's testimony was contrary to what Robbie had testified in that she testified that it was Robbie, and not her, who had shot and killed Beets, and that she merely assisted Robbie in disposing of his body. Appellant testified: "I could never hurt Jimmy Don ... I loved Jimmy Don. Nobody's ever been as good to me as he was." The record either reflects or indicates that Robbie had commenced living with appellant and Beets after he was released from jail for a burglary offense that he committed in Navarro County, and that prior to that time he had lived with his natural father. The appellant's attorney, who accused Robbie during his cross-examination of being the murderer of Beets, see *ante*, represented Robbie when he was accused, convicted, and placed on probation for committing the burglary in Navarro County. The bail bond fee and the attorney's fee apparently were paid by Beets. Appellant admitted during her testimony that she falsely reported Beets missing. Appellant also testified that after she, Beets, Bobby, and Bobby's friend returned from their vacation trip to Virginia, she and Beets suspected that Robbie had broken the propeller on the boat, which had also been hot wired; that Robbie had caused the tires on her truck, which was muddy and dirty, and not clean as it was when they left on their trip, to become flat; that Robbie took money out of a whiskey bottle that belonged to Beets; and caused the inside of the trailer house to become untidy. Appellant testified that this highly upset Beets. Robbie denied doing these things and blamed Shirley. Appellant testified that during the evening when Beets was supposed to have gone boating, before going to bed, he, Beets, and Robbie got into an argument over the above as well as over Robbie quitting his job. Appellant testified that the argument occurred when she was in the living room and Beets and Robbie were in the bedroom. The argument gen-

erated into fisticuffs.[12] Appellant testified that soon thereafter she heard a shot fired from a pistol. She then went into the bedroom where she saw Beets, whose head was bleeding and had blood coming from his mouth, lying on the floor. Appellant then told Robbie to go and find his brother Bobby, which Robbie did. Appellant then attempted to care for Beets, who appears to have then been dead, by putting a bedsheet over his body and telling him that if he were still alive he would understand that she and Robbie were going to bury him in their front yard in order to protect Robbie. Appellant testified that she telephoned Shirley and asked her to come to the trailer house, which Shirley did. When Shirley arrived, Beets' body was still in the bedroom. Shirley did not see the body. Shirley was told by appellant that Beets had gone to Dallas that evening with a friend. After appellant told Shirley "everything was all right", Shirley left and returned to her residence in Dallas. Appellant and Robbie then waited until Bobby was asleep, after which they took Beets' body and "put it into the planter. It wasn't a wishing well." Appellant told Robbie that if the authorities ever found Beets' body to say that he knew nothing about it "[a]nd that [she] would take the blame." Appellant's testimony regarding the other events that occurred that evening and the days that followed regarding finding Beets' body is pretty much cumulative to the other testimony that was adduced, except she denied that Marr and De Woody had come to her residence the Saturday morning after Beets was reported missing. Appellant testified that knowing Beets' body was buried in the front yard of their residence "bothered her and it always will. I had to move out of the trailer for a while. I couldn't stay there. When it got dark, I couldn't leave the living room and I couldn't go outside." Appellant also testified that approximately one year later Robbie told her that "we needed to move the body", but appellant told him that "I couldn't go through with it again." As to where the remains of Beets's body might now be, appellant testified that she did not know but testified that "I hope it was where his mama and daddy want him to be and where I bought the lots at." Appellant further testified that it was one of her attorneys, and not she, who suggested that she try and recover on the insurance policy or policies. She testified that "I didn't expect to get any of it ... I've never felt like I was entitled to anything." She admitted that she had sold Beets' boat, tried to sell a house that appears to have been Beets' separate property, and also testified that the house, which had mysteriously burned, was for sale before Beets disappeared. She admitted that she had tried to recover on a fire insurance policy, at her attorney's suggestion. She further admitted that she tried to take out the J.C. Penney insurance policy but that Beets cancelled it, after which he told her not to do such again until they had had an opportunity to discuss it. The facts are undisputed that other than several salary checks and the proceeds from the boat sale, appellant did not receive any other sums of money as a result of Beets' death. Appellant admitted that she had been previously convicted of a misdemeanor offense, which, on cross-examination, was shown to have been for public lewdness, which apparently occurred when she was in Charlie's Angels Bar, a Dallas bar, where she was then employed but was not working when whatever occurred happened. Appellant testified that she "auditioned" that night, without specifying what type audition it was for: "Well, it's a topless place but I wasn't topless." Appellant also admitted on cross-examination that she had been convicted of another misdemeanor offense that resulted when she shot another former husband, Bill Lane, in the side and stomach. We have not been made privy to the details of the Lane shooting. There is no evidence that appellant ever tried to kill Lane or cause Lane to disappear so that she could financially benefit from Lane's death. On cross examination, she denied knowing that

---

**12.** Dr. Petty, see *ante,* also testified that a fracture on Beets' cheekbone could have been caused "by a fight with another man."

Barker was buried in the backyard of her residence.

We pause to point out that the trial judge, pursuant to motion by defense counsel, restricted Bandy's cross-examination of appellant on her knowledge of Barker's disappearance and death to a single question, "Whether or not she was aware that the body of her former husband, Doyle Wayne Barker, was also buried on the premises?" As noted, appellant responded in the negative.

 Appellant asserts in her first ground of error that "[t]he first count of the indictment [on which she was convicted by the jury] is deficient in that it does not allege every constituent element of the offense." We disagree. We first point out that the ground of error on appeal does not comport with appellant's contention that was made in the trial court. It is now axiomatic that any error raised on appeal must comport with the complaint made in the trial court. See *Sharp v. State,* 707 S.W.2d 611, 619 (Tex.Cr.App.1986). Although appellant filed in the trial court a motion to quash the indictment prior to trial, which was overruled, her arguments in the motion went to her claims that the grand jury's indictment was based upon insufficient evidence; that the grand jury did not hear all of the evidence, both favorable and unfavorable towards appellant; that some of the evidence that it heard had been unlawfully obtained; and that because the appellant was not given the opportunity to appear before the grand jury the grand jury did not have the benefit of her testimony before it voted to return the indictment. As seen, with the exception of her complaint that she was not given the opportunity to testify before the grand jury, which right she did not have, see *Moczygemba v. State,* 532 S.W.2d 636, 638 (Tex.Cr.App.1976), in her challenge to the indictment her complaints in the trial court did not go either to *notice* or that the indictment did not state an offense, and was thus void, but, instead, went to *the evidentiary basis of the indictment,* which is an impermissible attack upon an indictment in this State. See *Brooks v. State,* 642 S.W.2d 791, 795 (Tex.Cr.App.1982), and the cases cited therein; also see *Culley v. State,* 505 S.W.2d 567, 569 (Tex.Cr.App. 1974). Furthermore, it is not necessary to allege the constituent elements of the aggravating feature of a capital murder charge. See *Andrade v. State,* 700 S.W.2d 585, 589 (Tex.Cr.App.1985). However, because a fundamentally defective charging instrument, i.e., one that fails to state an offense against the accused, may be attacked for the first time on appeal, and also may be attacked even after the conviction has become final, see *Thompson v. State,* 697 S.W.2d 413, 415 (Tex.Cr.App.1985), we will address the appellant's implied assertion that the indictment fails to allege the offense of capital murder by remuneration. We hold that it does. The indictment alleges that the appellant caused the death of Beets by shooting him with a firearm. This alleges the offense of murder. See V.T.C.A., Penal Code, Section 19.02. The additional allegation, "and the said murder was committed for remuneration, namely: money from the proceeds of retirement benefits from the employment of Jimmy Don Beets with the City of Dallas, insurance policies of the said Jimmy Don Beets in which the Defendant is the named beneficiary, and the estate of Jimmy Don Beets," alleges the aggravating element that elevates the offense of murder to capital murder. See V.T.C.A., Penal Code, Section 19.03(a)(3), which provides in part that the offense of murder is elevated to the offense of capital murder if "the person commits the murder for remuneration." We find and hold that the indictment alleges in the terms of the statute the capital murder offense of murder for remuneration. Also see the discussion in *McManus v. State,* 591 S.W.2d 505 (Tex.Cr.App.1980), which appears to have rejected a like contention as made here.

However, we find that appellant's arguments under this ground of error do not actually claim that the indictment does not state the capital offense of murder for remuneration, but are actually more suitable as argument under her second ground of error entitled "No evidence was offered

to sustain the charge of murder for remuneration," which we will later discuss.

Appellant's first ground of error is overruled.

■ Appellant asserts in her fourth ground of error that "[t]here was insufficient evidence for a conviction of Capital Murder as the prosecution relied on accomplice testimony to prove both elements of the crime and said accomplice testimony was not supported by other evidence tending to prove the elements of the crime of Capital Murder." Appellant argues under this ground of error that both Shirley and Robbie were, as a matter of law, accomplice witnesses to the Beets' killing. Because the arguments do not implicate the aggravating element of remuneration, and also because neither Shirley's nor Robbie's testimony went to the aggravating element, we limit our remarks to whether the testimony and evidence going to the killing of Beets were sufficient to corroborate the testimony of Robbie. We find it was.

■ The trial court instructed the jury that Robbie was, as a matter of law, an accomplice witness to the Beets' killing, and further instructed the jury that it could not convict the appellant upon Robbie's testimony unless it believed his testimony and also believed that there was other testimony in the case tending to connect appellant with the offense committed. The trial judge did not charge the jury either as a matter of fact or as a matter of law that Shirley was an accomplice witness to the Beets' killing. We find and hold as a matter of law that given the facts of this cause Shirley was not an accomplice witness to the Beets' killing. The most that the evidence established was that after the fact Shirley went to the appellant's residence. There is no evidence that after she arrived there she participated with Robbie or appellant in placing Beets' body in the "wishing well." A witness is not deemed an accomplice witness because he or she knew of the crime but failed to disclose it or even participated in concealing it. See *Marlo v. State,* 720 S.W.2d 496 (Tex.Cr.App.1986).

Given the trial court's instruction to the jury that Robbie was, as a matter of law,

an accomplice witness, see and cf. *Benson v. State,* 661 S.W.2d 708 (Tex.Cr.App.1983); *Ortega v. State,* 668 S.W.2d 701 (Tex.Cr.App.1984); *Boozer v. State,* 717 S.W.2d 608 (Tex.Cr.App.1986); *Williams v. State,* 696 S.W.2d 896 (Tex.Cr.App.1985), in deciding appellant's ground of error we will exclude Robbie's testimony as we must, see Art. 38.14, V.A.C.C.P., also see *Satterwhite v. State,* 726 S.W.2d 81 (Tex.Cr.App.1986); *Romero v. State,* 716 S.W.2d 519 (Tex.Cr.App.1986), and decide whether there was sufficient independent corroborative evidence outside of Robbie's testimony to establish the murder of Beets. We find there was. Appellant's admissions to Shirley that she killed Beets and the recovery of the remains of Beet's body that had been buried by appellant and Robbie in the front yard of her residence make out a complete case of murder against appellant. In *Romero,* supra, this Court, quoting from *Jackson v. State,* 516 S.W.2d 167 (Tex.Cr.App.1974), pointed out that admissions of a defendant, under most circumstances, will be sufficient to corroborate the accomplice witness. Given all of the facts and circumstances outside of Robbie's testimony, we find and hold that the independent evidence was sufficient to corroborate his testimony as to appellant's murdering Beets.

Appellant's fourth ground· of error is overruled.

In her second ground of error, appellant asserts that "no evidence was offered to sustain the charge of murder for remuneration." We construe her arguments under this ground of error, treated in conjunction with those made under her first ground of error which challenged the validity of the indictment, which we have overruled, *ante,* as asserting that the State failed to prove beyond a reasonable doubt the aggravating element of *remuneration.* Given the terms of Art. 37.071, V.A.C.C.P., which govern the punishment stage of a capital murder conviction, the claimed error is actually a challenge to the sufficiency of the evidence to sustain the jury's verdict finding the appellant guilty of *all* the elements of the offense of capital murder, i.e., the elements of murder *and* the aggravating

element of *remuneration.* We have held that the evidence is more than sufficient to sustain appellant's conviction for murder. We must now decide whether the evidence is sufficient to support a finding that the murder was done for *remuneration.*

Appellant contends that under Section 19.03(a)(3), supra, the unilateral act of murder will never establish the aggravating element of remuneration. Appellant further asserts that "financial gain by and of itself [is not] tantamount to remuneration," as that term is commonly defined and used. Appellant argues that when the common meaning of the term "remuneration" is applied to this cause, it is clear "[that she did not have] an arrangement whereby [she] was a party to a compact under which she received or was promised remuneration from a third party for killing [Beets]." Appellant also argues that "Remuneration was not intended by the Legislature ... to include mere financial or material gain to the accused. Such a definition of the term would bring within its sweep practically any instance in which the accused killed a member of his or her family; in which a beneficiary killed an insured; a remainderman killed the holder of a life estate; or a debtor killed an acquaintance to whom he owed a debt not evidenced in writing."

We find that appellant is quite correct when she states that "[n]o evidence whatever was offered to show that [she] was a party to a compact or agreement, either as principal or agent, by which remuneration was paid or promised to be paid [to her] for [her murdering Beets]." The evidence and testimony is clear that the only payors would have been the insurance companies and the City of Dallas, and there is no evidence in this record that they or anyone acting on their behalf had anything to do with the murder of Beets.

The State, in its response arguments, contends, albeit implicitly, that once it established that the appellant murdered Beets *and* also established that she was the named beneficiary of the insurance policies and the named beneficiary of the pension benefits it made out a prima facie case

of capital murder under the provisions of V.T.C.A., Penal Code, Section 19.03(a)(3), which provides in pertinent part the following: "(3) [the offense of murder becomes capital murder if] the person commits the murder for remuneration or the promise of remuneration." Because this is not a "murder for hire" killing case we disagree totally and completely with the State's reasoning and conclusion. Otherwise, we might agree with the State.

The contention that appellant presents appears to be the first time such contention has ever been presented to this Court for it to resolve. Today, we will resolve it and will resolve it in favor of appellant.

We find that the key to our resolving appellant's contention lies in the following: (1) What meaning must we give to the word "remuneration", which is not defined in either the Penal Code or the Code of Criminal Procedure; (2) What does the Legislative history of the remunerative provisions of the statute reveal; and, because this Court has not specifically construed or interpreted the term "remuneration", as found in the statute,[13] (3) How have courts of other States with similarly worded statutes construed and interpreted their statutes. We pause to point out that only three states other than Texas—Oklahoma, Idaho, and Tennessee have statutes worded exactly like ours; murder "committed for remuneration or the promise of remuneration," with 33 States having hired gun aggravating circumstance statutes, as we do, except they are not necessarily worded as our statute is worded, i.e., "[the person commits the offense of capital murder if he] employs another to commit the murder for remuneration or the promise of remuneration." The statutes from the other States have been broken down into three categories or groups, (1) murder committed for the purpose of receiving money or any other thing of monetary value, (2) murder committed for pecuniary gain, and (3) murder committed by one who was employed or hired to kill another or the defendant committed the murder by employing or hir-

---

**13.** As applied to this cause. See, however, *post.*

ing another person to kill another. Several States, such as Missouri, do not have, contrary to Texas, a specific aggravating element statute separately specifying robbery. The various statutes are compiled in *State v. McDonald*, 661 S.W.2d 497, 503 (Sup.Ct.Mo.1983).

The *Texas Government Code* provides in Section 311.011(a) that when a word or phrase is not statutorily defined, "[it] shall be read in context and construed according to the rules of grammar and common usage." *Webster's Ninth New Collegiate Dictionary* (1985 edition) defines the word "remuneration" as follows: "Something that remunerates, RECOMPENSE, PAY." 997. One of the definitions for the word "recompense" is "to pay for." *Webster's*, 984, supra. *Black's Law Dictionary* at 1460, (1979 edition), defines the word "remuneration" as follows: "Reward; recompense; salary." *The Compact Edition of the Oxford English Dictionary* at 2488, O.E.D. at 439, (1971 edition), defines the word "remuneration" in like manner. The research tool, *Words and Phrases*, informs us that the word "remuneration" is usually defined by courts to mean "a payment that is made by one person to another person in exchange for something that the latter did or agreed to do." In *State v. McDonald*, supra, the Missouri Supreme Court stated the following: " 'Remuneration' plainly implies payment from one person to another in compensation of services ... 1. to pay an equivalent for (as a service loss, expense) 2. to pay an equivalent to (a person) for a service, loss or expense. Webster's Third New International Dictionary, Unabridged (1981)." (503). The Oklahoma Court of Criminal Appeals, the only court in the Nation comparable to our Court, has interpreted the word "remuneration" as the Missouri Supreme Court did and further stated that "[t]o hold otherwise would require this Court to construe the language 'murder for remuneration' beyond its plain ordinary meaning." *Johnson v. State*, 665 P.2d 815, 824 (Okla.Cr.1982).

If we construed the statutory phrase, "the person commits the murder for remuneration or the promise for remuneration," to be limited to the above unanimous defini-

tional and plain ordinary meanings of the word "remuneration", we would be compelled to hold that for a person to be guilty of capital murder under that provision of the statute he or she must commit the murder with the expectation that another person or party will furnish the remuneration for the commission of the murder, i.e., that the murder was carried out as a "quid pro quo", or something for something, *Black's Law Dictionary*, 1123, supra, and that the appellant was the hired killer. *Boutwell v. State*, 659 P.2d 322, 328 (Okla. Cr.1983). This we find actually comports with what Judge W.C. Davis stated on behalf of this Court in this Court's opinion of *Doty v. State*, 585 S.W.2d 726, 727 (Tex.Cr. App.1979): "Murder for remuneration under Sec. 19.03(a)(3) involves, at a minimum, three individuals: (1) principal, (2) agent, and (3) victim." However, we will not stop here, but will next see how other States with identically worded statutes have construed their statutes.

The Oklahoma Court of Criminal Appeals appears to be the only court which has truly addressed the issue. In *Johnson v. State*, supra, that court stated the following: "We find that the traditional application for this aggravating circumstance (remuneration) has been where a defendant has been hired or has hired another person to perform an act of murder," citing this Court's decisions of *McManus* and *Doty*, supra, both of which dealt with murder for hire situations, and not the situation that we have at Bar. In passing, the Oklahoma court, apparently without realizing that it was assuming a contradictory position, stated that a murder other than for hire could be committed where the *motivation* was primarily to obtain proceeds from an insurance policy or was done to secure a devise or legacy. It cited this Court's decision of *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979). However, in *Boutwell v. State*, supra, the Oklahoma court returned to its previous meaning of the word "remuneration" and held in that cause that "[t]he aggravating circumstances of murder for remuneration is normally applied to the hired killer or to the hiree of a hired

killer." It further stated in *Boutwell,* supra, that "The wording and apparent purpose [of the statute] is not so broad as to include *all killings for pecuniary gain* ... Had the Legislature intended to provide a broader aggravating circumstance [such as 'for pecuniary gain'] it would have done so ... In the instant case, neither the facts nor a plain reading of the Oklahoma statute support either of the State's proposed constructions of Section 701.12(3) (that because the defendant was found with ill-gotten gains from the robbery-murder this established that he committed the offense for remuneration and that the killing occurred for financial gain). We therefore find that the aggravating circumstance of murder for remuneration is not supported by the evidence in the case."

Before turning to the Legislative history of our capital murder "remuneration" statute, we pause to address *O'Bryan v. State,* supra. We first point out that the issue appellant presents to this Court was neither presented nor raised in that cause. There is, however, a great deal of language in the opinion that relates to the defendant's "murdering his child in order to collect life insurance money." Such language might cause one to infer that this Court was construing the statute to mean that capital murder for remuneration has as one of its elements the element of motive. However, motive is not an element of the offense of murder or capital murder. E.g., *Garcia v. State,* 495 S.W.2d 257 (Tex.Cr. App.1973). Nevertheless, even if we inferred from the facts that were adduced in this cause that the appellant's motive in killing Beets was to profit by obtaining proceeds from life insurance or his pension benefits, this would not answer the question whether the appellant committed the murder for "remuneration", as that term is usually defined. Thus, because the issue was neither raised nor addressed in *O'Bryan,* supra, *O'Bryan* is inapplicable to this cause on this point.

We now turn to the legislative history of the statute. See *Government Code,* Section 311.023.

We find from an examination of the material that we have located that pertains to the Legislative history of Section 19.-03(a)(3), supra, as finally enacted, which commenced as House Bill 200, as well as our own independent research on the subject, see, for example, the *Practice Commentary* to Section 19.03, supra, that there is not a single shred of recorded evidence or testimony that might reflect or indicate that when the Legislature of this State was considering enacting the provisions of Section 19.03(a)(3), supra, it intended other than that under Section 19.03(a)(3), supra, "at a minimum, three individuals: (1) principal, (2) agent, and (3) victim" would be involved, or, to put it another way, the statute was meant to cover only the situation where the accused has been hired or has hired another individual to perform the act of murder of another individual, and was not meant to include all forms of pecuniary gain. This is exactly the way Judge W.C. Davis on behalf of this Court construed the statute in *Doty v. State,* supra, notwithstanding the fact that *Doty* actually involved an attempted murder for hire situation. This also comports with the way our sister Court of Criminal Appeals in Oklahoma has construed its statute, which is identically worded to our statute. See *Johnson v. State,* supra, at 824. This, of course, is not to state that the Legislature could not have provided a broader aggravating element, as other States, such as California, have done; it is only to state that our Legislature, in enacting the aggravating element of murder for remuneration, which elevates the offense of murder to capital murder, did not choose to do so.

Given the facts and circumstances of this cause, we find and hold that the State failed to prove beyond a reasonable doubt that the appellant caused the death of Beets *for remuneration.* The facts did not establish that this was a "murder for hire" case.

The judgment of the trial court is reversed and the cause is remanded with instructions to enter a judgment of acquittal only for the offense of capital murder.

ONION, P.J., concurs in the result.

W.C. DAVIS, McCORMICK and DUNCAN, JJ., dissent.

CLINTON, Judge, concurring.

V.T.C.A.Penal Code, § 19.03(a)(3) provides that a person commits capital murder if he murders under § 19.02(a)(1) and

> *"the person commits the murder for remuneration or the promise of remuneration* or employs another to commit the murder for remuneration or the promise of remuneration."* [1]

Our interest is in that statutory language underscored above, for the indictment tracked it and added "namely: money from the proceeds of retirement benefits [et cetera]." Though appellant challenges the indictment for failure to allege "every constituent element of the offense," it avers enough to admit proof on a theory that she committed the murder for hire by or as a "promisee" of remuneration from an unnamed person who was not barred from receiving part of the proceeds alleged. When there is no evidence of a hiring or of a "promisor," however, our immediate concern is whether the evidence is sufficient to sustain allegations in the indictment.

Here, sufficiency depends on meaning of the first part of § 19.03(a)(3). Facially, it is an offense for a person to commit murder for remuneration or on a promise of remuneration. Since a person cannot at once be both a "promisor" and "promisee," the statute naturally contemplates another person to make the promise of remuneration. Read in toto, just as there must be a "promisor" to promise remuneration, so also there must be a "remunerator" to remunerate. Thus, the first part denounces murder by one who receives from or is promised remuneration by another.[2]

The question raised here is whether the statute also may be read to dispense with a "promisor" or "remunerator." That ques-

tion has not been definitively answered by this Court. What few opinions it has rendered touching any aspect of this offense include:

> *Hobbs v. State,* 548 S.W.2d 884 (Tex.Cr. App.1977); *Brown v. State,* 561 S.W.2d 484 (Tex.Cr.App.1978); *Doty v. State,* 585 S.W.2d 726 (Tex.Cr.App.1979); *Lindsay v. State,* 588 S.W.2d 570 (Tex.Cr. App.1979); *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr.App.1979); *McManus v. State,* 591 S.W.2d 505 (Tex.Cr.App.1979); *Granger v. State,* 605 S.W.2d 602 (Tex. Cr.App.1980); *Johnson v. State,* 650 S.W.2d 784 (Tex.Cr.App.1983); *Duff-Smith v. State,* 685 S.W.2d 26 (Tex.Cr. App.1985).

*Hobbs, Brown, Lindsay* and *Johnson* implicate the second or "employing" part in a context of attempt, conspiracy or solicitation. *Doty* is also an attempt to hire situation, but it does broadly state: "Murder for remuneration under Sec. 19.03(a)(3) involves, at a minimum, three individuals: (1) principal, (2) agent, and (3) victim." *Granger* involved an "agent" who killed for remuneration or promise of remuneration, but the issue on appeal is sufficiency of corroboration of accomplice testimony. Thus we are left with *O'Bryan, McManus* and *Duff-Smith.*

The *O'Bryan* opinion begins, "This is an appeal from a conviction for capital murder, V.T.C.A.Penal Code, Sec. 19.-03(a)(3). . . . . Appellant was convicted of the murder of his eight year old son ... for remuneration or the promise thereof, namely, the proceeds from a life insurance policy on the life of [his son]." The latter sentence must be regarded as a statement of fact rather than a conclusion of law, since an issue as to proper construction of the underscored part of the statute was not raised by appellant nor addressed by the Court.

---

1. All emphasis is mine throughout unless otherwise indicated.

2. Forms for indictment and jury charge include the name of the "promisor" or "remunerator." See, e.g., 2 Texas Annotated Penal Statutes (Branch's 3rd Ed.) § 19.03, pp. 17 and 19;

McCormick & Blackwell, Texas Criminal Forms and Trial Manual, § 4.06, 7 Texas Practice 37, and § 93.06, 8 Texas Practice 412. Likewise, they are identified in some of the cases cited and discussed *post.*

In *McManus* prosecution was based on the first part of Article 19.03(a)(3). At the outset the Court similarly stated, "Appellant was convicted of acting with Paula Cantrell Derese to cause the death of Paul Cantrell for remuneration or the promise thereof, which was to be money from the proceeds of life insurance and the estate of Paul and Mary Cantrell." That is a paraphrase of actual language of the indictment, *viz:*

"[Accused] did then and there unlawfully, intentionally and knowingly, acting as a party with Paula Cantrell Derese and other persons to the Grand Jury unknown, cause the death of Paul Harvey Cantrell by [specified means], and said murder was committed for remuneration and the promise of remuneration, namely, money from the proceeds of life insurance and the estate of Paul Harvey Cantrell and Mary Bright Cantrell."

*Id.,* at 514. Responding to a claim that the indictment failed to give enough notice in certain particulars, the Court found the wording did not suggest "that appellant *employed* another to do the killing or that he promised *another* person compensation for doing it; it clearly alleges that *appellant* committed the murder and that *he was promised* compensation by another to do it." *Id.,* at 515. (Emphasis in original). After further discussing its allegations, the Court concluded:

"The gravamen of the capital murder offense charged in this indictment, of which appellant was given notice, was his having been promised compensation by Paula to kill the victims and on that basis, having killed them."

*Ibid.* Thus, the accused in *McManus* was alleged to have committed murder on a promise of compensation by another "to do it," and "on that basis," having done it. Since his conduct comes directly within the first part of Article 19.03(a)(3), the concept that he acted as a "party" is superfluous.

The Court summarized the action in *Duff–Smith* as follows:

"Appellant was convicted, as a party, of murdering his mother.... by strangling her with a panty hose for remuneration or the promise of remuneration, namely, proceeds from the estate of [his mother]."

However, the basis of prosecution was more complex: accused, acting with requisite intent, solicited et cetera another person, Walter W., to commit the offense; that person in turn solicited a third party who then hired a fourth person, and the latter actually strangled the victim. *Id.,* at 27.

The indictment charged two theories. First, that accused employed Walter to murder his mother "for remuneration and promise of remuneration, namely, money," and Walter strangled her with pantyhose "for remuneration and promise of remuneration, namely money from [accused]." Second, that accused caused the death of his mother by strangling her with pantyhose and "said murder was committed for remuneration and the promise of remuneration, namely the proceeds of the estate of [his mother]." *Id.,* at 33–34.

At that point, the *Duff–Smith* opinion observes, "Though both paragraphs of the indictment charge capital murder under V.T.C.A.Penal Code, Sec. 19.03(a)(3), the theories behind the two paragraphs differ." *Id.,* at 34. No authority is cited to validate the second theory under § 19.03(a)(3).

Paraphrased, the instruction authorizing the jury to convict required it to find that accused caused the death of his mother by strangling her with pantyhose "for remuneration or the promise of remuneration, namely, proceeds from the estate ... *in that* acting with specific intent [et cetera], [he] solicited, encouraged or directed Walter ... to commit this offense" and Walter then acted as a party with the third person who acted as a party with the fourth person who really did strangle the mother with pantyhose, "for remuneration or promise of remuneration, namely money...." From its view of that "party" instruction, the Court believed the State "ultimately proceeded under the theory embodied in the second paragraph of the indictment." *Ibid.*

Given the facts of the matter, however, such a "party" formulation describes an

offense more akin to the second part of § 19.03(a)(3) than the first. "Employing" is disguised as "party," just as "conspiracy" masked "employing" in *Lindsay*, supra, at 574 (Douglas, J., dissenting); *Hobbs*, supra, at 886, 887. See *Gamez v. State*, 665 S.W.2d 124 (Tex.App.—San Antonio 1983), PDR granted on other grounds.[3]

In this cause, however, appellant did the deed herself. There is no issue raised by evidence in the case that appellant committed the murder for hire by or as a "promisee" of remuneration from another party. All things considered, this is a question of first impression in this jurisdiction concerning the meaning and application of the statutory clause "the person commits the murder for remuneration or the promise of remuneration."

The opinion Judge Teague has written for the Court satisfactorily demonstrates that the statute requires either that an accused kill for remuneration from a culpable "remunerator" or on a promise of remuneration by a culpable "promisor," or that an accused employ another to kill for remuneration or a promise of remuneration. In short, be a "hired killer" or "hire a killer."

One who kills with an expectation of pecuniary gain derived solely from a blameless source does not commit capital murder within the meaning and intendment of § 19.03(a)(3).

The evidence proves only that appellant voluntarily and intentionally killed her husband with just such an expectation. It does not show she did so for the requisite remuneration from or promise of remuneration by a culpable party. Therefore, she is not guilty of capital murder.

3. "The proof at trial showed that appellant hired Castro to murder the deceased and that Castro did in fact shoot the deceased with a gun..... While appellant did not pull the trigger himself, clearly he is guilty of murder under the law of parties..... Further, because of the proof of the murder contract and the payment of the money, appellant is also guilty of capital murder. TEX.PENAL CODE ANN. § 19.03 (Vernon 1974)."

Accordingly, I join the judgment of the Court.

MILLER, CAMPBELL and WHITE, JJ., join in this opinion.

ON MOTION FOR REHEARING

W.C. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A.Penal Code, § 19.03(a)(3). After finding appellant guilty, the jury returned affirmative answers to the first two special issues under Art. 37.071(b), V.A.C.C.P. Punishment was assessed at death. On direct appeal, we reviewed three points of error presented by the appellant. We overruled the points pertaining to the alleged deficient indictment, as well as the sufficiency of the evidence to support a conviction due to a reliance by the prosecution on accomplice testimony. In regard to the third ground, on original submission we concluded that the State failed to prove beyond a reasonable doubt appellant caused the death of her husband for remuneration, as the facts of the case did not establish a "murder for hire" case. We concluded that the remuneration statute, § 19.03(a)(3),[1] supra, did not encompass a situation in which an accused murders another for the deceased's life insurance proceeds and retirement benefits.

In its motion for rehearing, the State argues that we erred in finding that a murder committed to obtain the proceeds of a deceased's retirement benefits and life insurance policies was not a murder for remuneration and therefore, not a capital felony under the provisions of § 19.03(a)(3), supra. We have examined this issue and now agree that the conduct proscribed by § 19.03(a)(3), supra, includes the killing of

1. (a) a person commits an offense if he commits murder as defined under § 19.02(a)(1) of this code and:

&ast; &ast; &ast; &ast; &ast; &ast;

(3) the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration.

a person in order to receive, or for the purpose of receiving, a benefit like an insurance settlement on the life of a deceased victim.

The record reflects[2] that on August 6, 1983, at the Redwood Beach Marina near Kemp, an empty boat was found drifting on the lake near the marina. After two marina customers brought the boat to shore, a fishing license issued to "Jimmy Don Beets" was discovered in the boat. The Coast Guard and Parks and Wildlife officials were notified. The authorities telephoned the Beets' residence several times and finally spoke to the appellant. She arrived at the marina to identify the boat and fishing license. Due to high winds, the authorities decided a search for Beets's body would commence the following morning.

The following day, Deputy Sheriff Marr and Fire Chief De Woody visited appellant to inquire as to Beets' possible return home. Appellant stated that her husband had gone fishing the night before but had not returned. At trial, appellant denied Marr and De Woody's visit to her home. Denny Burks of the City of Dallas Fire Department called on appellant several times after her husband was reported missing. Appellant inquired as to Beets's coverage under his insurance policies and pension benefits. Burks promised to look into the matter for her. He later learned Beets's life was insured for close to $110,000. Furthermore, appellant would be entitled to receive almost $1,200 each month in pension benefits. He relayed this information to appellant. The Dallas City Attorney also informed appellant through her attorney of a mandatory seven year waiting period before any payment of insurance proceeds as Beets's body had not been recovered.

In the spring of 1985, two years later, Rick Rose, an investigator for the Henderson County Sheriff's Office became involved in the disappearance of Beets. He had received credible, confidential information that the cause of Beets's death posed possible questions. At that time, neither Beets's body nor any remains thereof had been discovered. After an investigation, Rose secured an arrest warrant charging appellant with the murder of Beets. She was arrested June 8, 1985. After appellant was incarcerated, Rose secured an evidentiary search warrant. Pursuant to the execution of the search warrant, the physical remains of Beets and Doyle Wayne Barker, another former husband of appellant, were discovered buried on the premises of the Beets residence. Two bullets were recovered from Beets's remains. The Dallas Forensic Science Laboratory identified the remains of the bodies as Beets and Barker. A Collector's item pistol recovered from the appellant's residence as a result of another incident was also turned over to the Dallas laboratory.

Robert "Robbie" Branson, son of appellant, testified at trial. At the time appellant falsely reported her husband missing, Robbie was living with them. Appellant told Robbie of her plan to murder Beets, and at her request, he left the residence. Two hours later, he returned and learned she shot and killed her husband. He assisted his mother in placing Beets's body in the site constructed as the "wishing well." The following day, appellant placed Beets's heart pills in his boat. Robbie took the propeller from the boat and abandoned it in the lake. Afterward, appellant met her son and the two of them returned home. At trial, Robbie admitted his participation in burying the body in the wishing well, but denied having killed Beets. He remained silent for two years to "protect his mother"; however, he chose to cooperate with the authorities to avoid prosecution.

Shirley Stegner, daughter of appellant, testified that her mother telephoned her on August 6, 1983. Appellant requested her daughter come to the house. Shirley asked her mother if the plan to kill Beets was completed. Appellant responded in the affirmative. Appellant had discussed the elaborate scheme with her daughter in which appellant would kill Beets, have Robbie drop the body in the lake, and set the boat adrift to appear as if Beets accidental-

---

2. We will follow the presentation of the facts of our previous opinion.

ly drowned. After Shirley arrived at her mother's house, appellant sent her home as "everything was taken care of." Several weeks later, appellant informed Shirley that "she and Robbie buried Beets in the wishing well."

The trial judge permitted the testimony relating to the death of Barker, appellant's former spouse. Shirley testified to events which occurred two years prior to Beets's disappearance. On October of 1981, appellant told Shirley "she was going to kill Doyle Wayne Barker" because "she couldn't put up with any more of him beating her and that she didn't want him around anymore." Furthermore, the trailer house was in Barker's name, and if she were to obtain a divorce, he would receive it. Three days later, appellant told Shirley, "it was all over with and she had done what she intended to do." Appellant waited until Barker was asleep, then she covered the gun with a pillow and fired it twice into Barker's head. Shirley assisted her mother in disposing of the body. They placed him in a hole in the back yard. The next day, they purchased cinder blocks and built a patio over the hole. Subsequently, a storage shed replaced the patio.

Dr. Charles Petty, the Chief Medical Examiner and Director of the Dallas County Forensic Science Laboratory, testified to the post-mortem autopsy. He identified the bodies as those of Beets and Barker. The cause of death of Beets was "the gunshot wound defect in the skull and in the trunk." Petty was unable to positively testify that one bullet was fired from the Collector's item pistol. In regard to Barker, three bullets were recovered from his skeletal remains, and the cause of death was "gunshot wounds."

Allen Jones, a firearms examiner for Dallas County Forensic Science Laboratory, examined the fired bullets. The bullets were fired from a .38 caliber weapon, but he was unable to testify positively that they were fired from the Collector's item pistol.

Jackie Collins, niece of Beets, and employee of J.C. Penney Life Insurance Company, testified that the deceased cancelled an insurance policy in the amount of $10,000 on May 19, 1983. The insurance application was completed without his knowledge. Collins noticed the application because the address on the form was not that of the deceased but that of appellant's daughter. Appellant was the named beneficiary on the application. Appellant did not deny completing the application, signing the deceased's name and returning it with the monthly payment.

Peggy Sherrills Webb, an employee of the City of Dallas, and the "Benefits Supervisor with Personnel", testified that the deceased had a life insurance policy in the amount of $86,000. Appellant was the named beneficiary of the policy.

George Chaney, a document examiner employed for twenty-three years by the Secret Service, and presently employed by a local document examiner in Dallas, testified that the signature on the J.C. Penney insurance application was signed by appellant, but the signature authorizing the cancellation of the policy was the deceased's signature. Chaney further testified that the signature on the certification of transfer for a boat sold by appellant after Beets's death was that of the appellant.

Jerry Hast, an employee of the City of Dallas, and the "Administrator of the Dallas Police and Fire Pension Fund", testified concerning an application for benefits filed by an attorney on behalf of appellant. He testified that the pension board voted to approve a settlement with appellant for her pension benefits. The settlement would be finalized on June 10, 1985. However, the settlement was cancelled after members of the board learned appellant was arrested for the murder of Beets. The appellant was to receive $15,852.59, plus a monthly benefit of $790.42 for the rest of her life as long as she remained single.

E. Stewart Elrich, Jr., Manager of the Group Life Claim Department of Republic National Life Group Insurance Company, testified his company issued a life insurance policy on the deceased in the amount of $23,428. The policy also contained an accidental death provision in the amount of $20,000. An attorney wrote the company

on behalf of appellant stating that "an application had been made for administration of an estate." No action was ever taken on the attorney's demand letter.

The defense called Faye Lane, another daughter of appellant. Lane testified that neither Robbie nor Shirley spoke of their mother's confession of killing Beets or Barker, nor of participating in their burial after killing them. Lane also testified that "everything that [Robbie has] ever told her, [she] believed."

Raymond Bone, who lived with appellant after Beets's disappearance, also testified. Bone entered into an agreement with law enforcement officials to keep them posted as to the whereabouts of appellant. Before appellant was arrested, Bone notified the authorities as to her whereabouts. Bone did not believe the appellant killed Beets. In support of his belief, he offered the following: "I lived with her and ... she always treated me decent."

Bobby Wayne Branson, son of appellant, testified that prior to Beets's disappearance, Robbie and Beets had a "couple" of arguments. Bobby also testified to living with his mother and Barker during their marriage. Some time later, Bobby noticed Barker was no longer around the house. He inquired as to Barker's whereabouts. Appellant replied: "[H]e was just gone ... he left."

Appellant testified in her own behalf. In regard to the killing of Beets, her testimony was contrary to statements of her son Robbie. She testified that Robbie shot and killed Beets, and that she merely assisted him in disposing of the body. Appellant stated, "I could never hurt Jimmy Don ... I loved Jimmy Don. Nobody's ever been as good to me as he was." She admitted to falsely reporting Beets as missing. Appellant testified that the evening Beets allegedly went boating, he and Robbie began arguing. The argument occurred in the bedroom. Appellant was in the living room. The argument generated into physical blows. Soon thereafter, appellant heard a shot fired from a pistol. She went into the bedroom and saw Beets lying on the floor. Appellant told Robbie to find his brother Bobby. She attempted to care for Beets, who appeared dead, by putting a bedsheet over his body. She proceeded to tell him, as if he were still alive, he must understand that to protect Robbie, they must bury him in their front yard. Appellant then telephoned Shirley, and asked her to come to the trailer house. When Shirley arrived, Beets's body was still in the bedroom. Shirley did not see the body. Appellant told Shirley that Beets had gone to Dallas that evening with a friend. After appellant told Shirley "everything was all right", Shirley left and returned home to Dallas. Appellant and Robbie waited until Bobby was asleep. They then "put Beets's body into the planter." Appellant told Robbie "[she] would take the blame" if the authorities ever discovered the body.

Regarding insurance and benefits, appellant testified that one of her attorneys suggested a recovery on the insurance policies. She stated, "I didn't expect to get any of it ... I've never felt like I was entitled to anything." She admitted to selling Beets's boat and trying to sell a house that was Beets's separate property. However, the house (which mysteriously burned) was for sale before Beets disappeared. She admitted to trying to recover on the fire insurance policy. She further admitted to taking out the J.C. Penney life insurance policy that Beets eventually cancelled.

On cross-examination, appellant admitted to a previous conviction of the misdemeanor offense of public lewdness. She also admitted to having another misdemeanor conviction for shooting a former husband, Bill Lane, in the side and stomach. She denied knowing that Barker was buried in the back yard of her residence.

■ In this motion for rehearing, the State argues that we erred in finding that a murder committed for the purpose of obtaining the proceeds of a deceased's retirement benefits and life insurance policies was not a murder for remuneration and therefore, not a capital felony under the provisions of V.T.C.A., Penal Code, § 19.03(a)(3) and (b). The statute provides:

(3) the person commits the murder *for remuneration* or the promise of remu-

neration or employs another to commit the murder for remuneration or the promise of remuneration. (emphasis added)

An inquiry into the meaning of the word "remuneration" does not uphold the proposition that "murder for remuneration" is limited to "murder for hire," as we found on original submission. Webster's New International Dictionary, Third Edition, Unabridged, 1971 defines "remunerate" as:

1) to pay an equivalent for (as a service, loss, expense); 2) to pay an equivalent to (a person) for a service, loss or expense: recompense, compensate: *syn* see *pay*.

In Webster's Second New International Dictionary, Unabridged, 1948, it instructs on the usage of "remunerate" as:

Remunerate frequently adds to compensate the implication of reward; as 'He that would kill him should have a great remuneration and double wages.' Compensate and remunerate are often politely used when pay might have a more or less offensive connotation.

It is apparent that the definition of "remuneration" does not mandate the narrow construction requiring salary, payment, or reward paid to an agent by his principal as in a strict murder for hire situation. Remunerate encompasses a broad range of situations, including compensation for loss or suffering and the idea of a reward given or received because of some act. We shall adhere to § 1.05 of the Texas Penal Code which requires that "the provisions of this Code shall be construed according to the fair import of their terms." See V.T.C.A. Penal Code, § 1.05. In the instant case, the import of remuneration is one paid for a loss or suffering. While previous cases may not provide an absolute resolution to our interpretive analysis, it is instructive to examine several of our prior decisions where we find at least implicit acceptance of the broader interpretation of § 19.03(a)(3), supra.

Contrary to our position on original submission, analysis of several previous remuneration cases supports the argument advanced by the State that this Court has at least implicitly decided the issue adverse to the appellant. In *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979), the defendant was convicted for the murder of his eight year old son, Timothy, for remuneration or the promise thereof, namely the proceeds from a life insurance policy on the life of Timothy. We affirmed the conviction and death sentence in the case. As in the instant cause, the indictment in *O'Bryan*, supra, alleged murder "for remuneration", namely the proceeds of a life insurance policy. In the instant appeal, the evidence reflects that appellant killed her husband for the proceeds of the life insurance policies and pension benefits. Appellant would receive $43,428.33 in an accidental death policy, another $86,000 from a policy with the City of Dallas, $15,852.59 from the pension board and a monthly benefit of $790.42 the rest of her life as long as she remained single, in addition to $3,200 from the sale of the deceased's Glastron ski boat. She also filed a claim under a fire insurance policy for damage to the separate property home in the estate of Jimmy Don Beets. In *O'Bryan*, supra, the facts supported the proposition that the defendant killed the deceased in the manner proscribed in § 19.03(a)(3), murder for remuneration or murder for pecuniary gain. The facts in the instant case support the same conclusion.

We again construed the term "remuneration" in *McManus v. State*, 591 S.W.2d 505 (Tex.Cr.App.1979). The appellant had been charged with murdering the victims "for remuneration or the promise thereof, which was to be money from the proceeds of life insurance and the estate of Paul and Mary Cantrell." *Id* at 510. Appellant challenged the sufficiency of the evidence to show that the murder was committed for remuneration or the promise thereof. We held the evidence was sufficient to prove the remuneration element and in so doing, noted the following:

The conduct proscribed by this section of the capital murder statute is the killing of any person in order to receive, or for the purpose of receiving some benefit or compensation. Thus, the focus of the criminal culpability is upon the actor's state of mind.

*Id.* at 513.

In *McManus, supra,* the appellant killed his victims in expectation of receiving a portion of the proceeds from the victims' life insurance and estate. It was never proven that the victims' daughter, Paula Cantrell, promised appellant a share in the ill-gotten gains. There was no showing of a culpable "promisor." The lack of such a promisor was irrelevant in regard to the sufficiency of the evidence to sustain the remuneration element. The element was fulfilled by the appellant's expectation of receiving money as a result of the killing:[3]

> The record clearly reflects that appellant expected to share in the proceeds from the estate of the victims and that he acted out of an expectation that he would receive such remuneration.

*Id* at 513.

Therefore, contrary to what was stated on original submission, the existence of a "culpable promisor" is not required to establish remuneration as reflected here. The focus is on the actor's intent or state of mind: Did the actor kill in the expectation of receiving some benefit or compensation, e.g., life insurance proceeds, pension benefits? If so, remuneration outside the sphere of "murder for hire" cases is established.

A more recent case further illustrates remuneration in expectation of financial reward. In *Duff-Smith v. State,* 685 S.W.2d 26 (Tex.Cr.App.1985), the indictment charged two theories of remuneration; the first paragraph alleged "murder for hire", and the second paragraph alleged "murder for proceeds of his mother's estate." The State ultimately proceeded on the "murder for proceeds of his mother's estate." Whereupon, the appellant in *Duff-Smith, supra,* was convicted and sentenced to death under the theory of remuneration, or murder for financial gain. The *Duff-Smith, supra,* theory is similar to the theory in the instant case.

In affirming the conviction in the *Duff-Smith, supra,* case, we reviewed the sufficiency of evidence supporting the conviction in regard to the corroboration of the accomplice testimony. We held the accomplice testimony was sufficiently corroborated with respect to the remuneration element. The testimony was corroborated as there was evidence "... to support the State's theory that the appellant's primary motive in having his mother killed was his desire to immediately reap the proceeds of her estate." *Id* at 33. The accomplice testimony was corroborated in regard to the remuneration element, as the evidence indicated the killer murdered the victim in order to receive his mother's estate. In both *McManus, supra,* and *Duff-Smith, supra,* we examined the remuneration theories advanced by the State. We affirmed the cases upon finding the theories sufficiently proven. The above cases are identical to the case at bar, a murder for gain or reward.

In our prior opinion, we also discussed the Oklahoma Court of Criminal Appeals opinions in *Johnson v. State,* 665 P.2d 815, (Okla.Cr.1982) and *Boutwell v. State,* 659 P.2d 322 (Okla.Cr.1983). We inadvertently concluded that the meaning of the word "remuneration" is "not so broad as to include all killings for pecuniary gain." In the Oklahoma cases cited by the majority, the Oklahoma court considered whether a robbery-murder was a murder for remuneration under the Oklahoma capital murder statute. The Oklahoma court rejected this contention upon finding that the mere showing a murder was committed in the course of robbery does not amount to a showing of a murder for remuneration. There was no indication that the defendants committed the murders primarily to obtain financial reward.

In *Boutwell, supra,* the purpose of the killing was to avoid identification. *Id* at

---

**3.** To further bolster our decision, we held that the appellant's expectation of remuneration arose from an "implicit" promise that Paula Cantrell would pay him out of insurance proceeds. But, while it may be argued that *McManus* does fall within the usual "murder for hire" cases because of that "implicit" promise, the *McManus* court relied first on that appellant's state of mind and expectation of reward. The evidence showed the gunman in fact stole the money from Cantrell's purse on a subsequent occasion.

328. Moreover, the *Boutwell, supra,* court observed that the aggravating circumstances or murder for remuneration is *normally* applied to the hired killer or to the hiring of a hired killer. However, the court further recognized that such a construction of the term is not so restrictive. The court observed that "murder for remuneration has also been applied to killings motivated primarily to obtain proceeds from an insurance policy, [and] murder of a testator in order to secure a devise or legacy ..." *Johnson, supra,* at 824. It is therefore evident the Oklahoma Court of Criminal Appeals construes "remuneration" to include scenarios other than "murder-for-hire." In *Chaney v. State,* 612 P.2d 269 (Okla.Cr.1980), the defendant kidnapped his victims, held them for ransom, and eventually killed them. *Id* at 269. The Oklahoma Court of Criminal Appeals held that the evidence supported the jury's finding that "... the defendant committed the murder for remuneration or the promise of remuneration, in that he killed both (victims) while attempting to extort $500,000 ..." *Id* at 282, fn. 1. The murder was committed "for remuneration" as the killer's primary motivation was financial gain through extortion money. This case exemplifies a "murder for remuneration", not a "murder for hire". In conclusion to our examination of the Oklahoma cases, we note the Oklahoma court never construed "remuneration" as to limit the statute to "murder-for-hire" scenarios.

On original submission, we also attempted to ascertain the legislative intent behind § 19.03(a)(3), *supra.* The capital murder statute was derived from House Bill 200, passed by the 63rd Legislature. See Acts 1973, 63rd Leg., ch. 426, p. 1122. To determine legislative intent, we have reviewed the legislative history of § 19.03(a)(3), *supra,* which commenced as House Bill 200, Acts 1973, 63rd Leg., Ch. 426. In our prior opinion, we construed § 19.03(a)(3), *supra,* as applicable only in a situation involving a minimum of three individuals: a principal,

agent and victim. See *Doty v. State,* 585 S.W.2d 726 (Tex.Cr.App.1979). However, this interpretation of the statute does not comport with the *O'Bryan, supra, McManus, supra,* and *Duff–Smith, supra,* decisions.

Therefore, to the extent that *Doty, supra,* requires there to be a "minimum" of three actors to constitute the capital offense of murder for remuneration, it is hereby overruled. See also *Hobbs v. State,* 548 S.W.2d 884 (Tex.Cr.App.1977). Moreover, after the *O'Bryan, supra,* case was handed down in 1979, the Legislature met and considered the provisions of the capital murder statute without changing or amending the pertinent provision in the case at bar. In 1983, the Legislature considered the provisions which raise murder to a capital felony and amended § 19.03(a)(2), *supra.* In 1985, the Legislature again considered the provisions which raise murder to a capital felony and added § 19.03(a)(6), *supra.* But most significantly, after *O'Bryan, supra,* the Legislature has never considered amending § 19.03(a)(3), *supra,* to narrow the meaning of remuneration strictly to a murder-for-hire situation. A close reading of the statute compels the conclusion that § 19.03(a)(3), *supra,* be construed as follows: an individual commits a murder

(1) for remuneration or

(2) the promise of remuneration or

(3) employs another to commit the murder for remuneration or

(4) employs another to commit the murder for the promise of remuneration.

The statute is multi-faceted, by its very terms, including not only a killing performed for a principal by an agent, but also a murder by a principal with the expectation that he or she would gain from the benefits assessed on the death of the victim, or gain under the laws of probate or descent and distribution upon the death of the victim. Therefore, we interpret § 19.03(a)(3), *supra,* as inclusive of a murder for gain or profit [4] where the actor's

---

4. Under our capital scheme, the murder "for gain or profit" is, of course, distinguished from other listed means of murder during the course

of robbery or kidnapping for purposes of ransom. In the former case, the State has a heavy burden of demonstrating that the murder was

unilateral conduct results in the death of the victim.

We hold, therefore, that a person commits a murder for remuneration as set out in § 19.03(a)(3) and (b), supra, where the actor kills a victim in order to receive a benefit or financial settlement paid upon the death of the victim, such as proceeds of insurance and retirement benefits as in the present case. Having held thus, we must now turn our attention to appellant's remaining points of error not addressed on original submission.

In her third point of error, appellant contends the trial court erred in admitting evidence that she shot and killed a former husband, Doyle Wayne Barker. She specifically argues that the evidence was improperly admitted to rebut a defensive theory not raised by the defense, and claims further that such evidence, even if relevant, should have been suppressed since its probative value was outweighed by its prejudicial effect upon her trial. The State responds by arguing that the extraneous offense was properly admitted as evidence showing common planning and design, as well as to rebut a defensive identification issue. The State denies the allegation that the probative value of the evidence was outweighed by the prejudicial effect of the evidence on the capital jury.

The record reflects that Investigator Rose received information from a confidential source that the bodies of both Beets and Barker were buried at appellant's residence, one within the flower planter or "wishing well" and the other beneath the storage shed on the property. Execution of a search warrant after appellant's arrest resulted in the discovery of the bodies of the two men, both of whom suffered very similar fatal gunshot wounds and whose bodies had been disposed of by placing each corpse in a sleeping bag and hiding each body under a structure on the property.

By motion in limine appellant sought to suppress any mention of the discovery of Barker's body or appellant's alleged participation in his murder. Before trial began, the trial judge instructed the prosecutor not to mention the Barker incident and to instruct his witnesses not to mention the incident unless asked a question by (defense) counsel. The trial court specifically declined to rule on any "evidentiary" implications "until the time of trial."

The sixth witness called during the State's case-in-chief was Investigator Rose. Obeying the court's instructions regarding the motion in limine, the State asked that the jury be excused before going into the extraneous matter. Outside the jury's presence Rose testified that his confidential informant had told him two bodies were buried on the property. After hearing from both sides, the trial court sustained appellant's motion "at this time" but stated the evidence might be admitted at a later point during trial. As appellant points out, the court's rationale at this time was that the prejudicial effect of the extraneous murder would be too great.

After calling Robert Branson to the stand, the State called his sister, Shirley Stegner. She testified that appellant had confided her intent to shoot Beets and set his boat adrift one week before his disappearance and had confirmed the fact of the murder in subsequent conversations with Stegner. Outside the jury's presence Stegner was then asked whether appellant had ever placed her in a similar position. She responded in the affirmative, relating how in October of 1981 appellant had confided her intent to kill Barker: "She said that she was going to wait until he went to sleep and then shoot him." Two days later, appellant told Stegner that it was "all over" and Stegner helped appellant dispose of Barker's body.

The State argued that the evidence of the extraneous offense was admissible to show "the design, the intent, the scheme that's

---

performed for the reason of pecuniary gain, as was proven in O'Bryan v. State, supra. In the latter cases, the State must only show that an intentional killing took place "during the course of" the underlying felony. It is apparent, there-

fore, that the nexus between a defendant who kills for pecuniary gain and his motive for that act is closer and of more importance than a defendant who intentionally kills during the course of other felonious conduct.

involved here and the defensive theory that was raised wherein Defense Counsel accused the witness, Robbie Branson, of doing the murder". Defense counsel responded by saying, "I didn't accuse Robby (sic) Branson of any murder on Wayne Barker. I've been very careful to limit that. Everything that's been mentioned here has been mentioned as to Jimmy Don Beets." After hearing both arguments, the trial judge first noted that he had previously reserved a final ruling on the motion, then ruled the evidence of the extraneous offense was admissible, based upon the testimony already elicited, as an exception to the rule against the admission of extraneous offenses. Appellant's "exception" to the ruling was noted. When the jury was returned, Stegner testified to the facts stated *supra*. In addition, Investigator Rose was recalled to the stand and testified that the remains of Doyle Wayne Barker were unearthed from the back yard of appellant's residence at the same time the body of Jimmy Don Beets was recovered from the front yard. Rose was also allowed to testify that both Shirley Stegner and Robert Branson had told him that appellant had killed Barker.

■ It is well established in the jurisprudence of this state that an accused person may not be tried for collateral offenses or for being a criminal generally. *Parks v. State*, 746 S.W.2d 738 (Tex.Cr.App.1987); *Williams v. State*, 662 S.W.2d 344 (Tex.Cr. App.1984); *Albrecht v. State*, 486 S.W.2d 97 (Tex.Cr.App.1972). Evidence of extraneous offenses is by nature inherently prejudicial and carries the additional danger of forcing a criminal defendant to defend himself against an implied charge of having a propensity to commit crimes rather than the specific charge the State has brought against him. See *Parks*, supra; *Williams*, supra; *Elkins v. State*, 647 S.W.2d 663 (Tex.Cr.App.1983); *Bates v. State*, 643 S.W.2d 939 (Tex.Cr.App.1982). There are, however, certain recognized exceptions to this general rule that extraneous offenses are never admissible at trial of an accused. See *Albrecht*, supra. This is because circumstances exist in a variety of fact situations which either mitigate the danger of

such evidence or which justify admission of extraneous evidence in spite of the danger that this evidence will create unfair prejudice. *Parks*, supra; *Boutwell v. State*, 719 S.W.2d 164 (Tex.Cr.App.1985); *Albrecht*, supra. Included in that non-exclusive list where evidence of an accused's extraneous criminal conduct has been held admissible are situations where (1) the offense is admitted to show the context in which the criminal act occurred; (2) the extraneous offense circumstantially proves identity where the State lacks direct evidence of the perpetrator's identity; (3) the offense goes to the issue of scienter, where the necessary mental state for a particular act cannot be inferred; (4) the offense shows the accused's motive for his conduct, particularly where the charged offense is intertwined with the collateral act or is part of a continuing plan or scheme of criminal behavior; (5) the extraneous conduct shows malice, where malice is an element of proof and cannot be inferred from the charged criminal act; and (6) the offense is offered to refute a defensive theory raised by the accused. See *Albrecht*, supra.

As we have previously stated in *Parks* and *Williams*, both supra, although the list in *Albrecht*, supra, is an accurate statement of the law of evidence at this time, it was not meant to be an exhaustive or exclusive list of exceptions to the general rule regarding the admissibility of extraneous offenses. See also *Morgan v. State*, 692 S.W.2d 877 (Tex.Cr.App.1985). The true "test" of extraneous offense admissibility is a showing by the prosecution "both that the transaction is *relevant* to a *material* issue in the case; and, the relevancy value of the evidence outweighs its inflammatory or prejudicial potential." *Williams*, supra, quoting from *Rubio v. State*, 607 S.W.2d 498 (Tex.Cr.App.1980) (concurring opinion). We shall, therefore, turn our attention to applying the *Williams*, supra, two-prong test to the facts of the instant case.

■ As appellant correctly points out in her brief, the jury in this case was instructed to consider the extraneous evidence regarding the murder, burial and subsequent exhumation of Barker's remains for the

limited purpose of proving the identity of Beets's killer. Appellant argues that identity was never at issue, since the defense did not dispute that she was the person indicted or that she was present at the scene when Beets was shot. Appellant also contends that the only "defensive theory" presented was that she was being improperly tried for both murders since the indictment under which she was tried charged her only with the murder of Beets. We disagree on both counts.

The State's theory of the case began and ended with circumstantial evidence going to prove that appellant planned the murder of her fifth husband in order to receive various monetary benefits, after which she proceeded to carry out that plan. Her "signature" in the crime was distinctive. She shot the deceased in the back of the head with a .38 calibre handgun while he was sleeping. She then enlisted the assistance of her son to help dispose of the body in a unique manner. On his own property, within a "wishing well" he had built for her, appellant buried the deceased after placing his body into a sleeping bag. In a macabre twist, she then set out flowers in the "planter." In the next two years, appellant sold off personal property belonging to the deceased, tried to collect on fire insurance on one or two of the deceased's rental properties, and hired an attorney who applied for various death benefits on her behalf after successfully having Beets declared legally dead.

The State offered the above evidence through the testimony of nineteen witnesses, including Robbie Branson and Shirley Stegner, two of appellant's children. Branson's testimony was especially damning to the defense effort, as he related how he was sent away from the trailer house by appellant after she told him she was going to kill Beets, then returned to help her drag the sleeping-bag-encased body of Beets around the house and bury him in the well. On cross-examination, the following occurred:

(Q) When is the first time you told anyone about this?

(A) About a year or so later.

(Q) Kept—it was really bugging you, wasn't it?

(A) Yeah.

(Q) It was bugging you because you killed the man, that's the reason it was bugging you, wasn't it?

(A) No sir.

(Q) You killed him and you killed him with a handgun, didn't you?

(A) No sir.

\* \* \* \* \* \*

(Q) Had a bunch of them, haven't you? This is the first time you ever killed a man?

(A) I've never killed anyone.

(Q) Yeah, you have ...

Appellant's contention is simply without merit. From defense counsel's cross-examination of the witness Robbie Branson, it is clear that the defensive theory was to place Branson's finger upon the trigger of the murder weapon. By doing so, the defense directly contested a material issue in the case—the identity of the triggerperson in the charged crime. The indictment in this cause charged *appellant* with killing the deceased for remuneration; she was not charged with the companion offense under § 19.03(a)(3), supra, of hiring another to do the killing for her. It was therefore necessary for the State to prove that appellant was the triggerperson. To rebut the State's theory, the defense introduced testimony demonstrating that another individual, Robbie Branson, had an equal or superior opportunity, motive and criminal background to commit the deed as did appellant; and that it was Branson who actually committed the murder. The State correctly pointed out these salient facts in arguing for admission of the extraneous offense. The record clearly reflects that appellant raised the issue of identification at trial. See *Moore v. State,* 700 S.W.2d 193 (Tex. Cr.App.1985). Identity being both a material and disputed issue in the case, we find that the circumstantial evidence regarding the killing of Barker made it more probable than not that appellant was the triggerperson in the instant offense and, as such, it was relevant. See *Williams,* supra.

It remains to weigh the probative value of the evidence relating to Barker's death against its inflammatory or prejudicial potential. In assessing this balance between the probative value of the extrinsic evidence versus its prejudicial effect, it is necessary to view the nature of the State's case. *Parks, supra.* The State's case consisted entirely of circumstantial evidence. Although both Branson and Stegner testified appellant voiced intent to kill Beets before the incident occurred and admitted the act after the fact, there was no eyewitness to the actual killing. The State's case, therefore, depended on two members of appellant's family, both of whom suffered problems of credibility due to rigorous cross-examination by counsel. Stegner was portrayed as a drunk and a dope addict with a propensity for violence, as evinced by an argument with her husband where she used a .357 magnum revolver to keep her husband away from her. Stegner also admitted her drinking sometimes led to periods of time in which she "blacked out."

Robbie Branson, the acknowledged accomplice in disposing of the body, also had his credibility impugned on cross-examination. Branson admitted to a prior burglary conviction and was accused of passing stolen checks. He too had a part in the incident at the trailer house where Stegner discharged the .357 handgun. He admitted waiting over a year before saying anything about the murder. He also admitted to other incidents taking place while appellant and the deceased were on vacation immediately preceding the murder where he "hotwired" the deceased's boat and wrecked one of the deceased's motorcycles. The record reflects that counsel for appellant rigorously called into question Branson's motive for testifying and introduced into evidence before the jury sufficient circumstantial facts which brought the question of identity into issue. That the jury chose not to believe the defense version of facts surrounding the murder is of no consequence; the fact remains that an alternate theory was advanced for the fact-finder's

determination, a positive strategic move to combat the circumstantial evidence presented by the State to prove up the identity nexus between appellant and the triggerperson.

Even though the question of identity was disputed, the extraneous matter may still be inadmissible unless there are distinguishing characteristics common to both offenses such that the accused's acts are earmarked as his handiwork; his "signature" must be apparent from a comparison of circumstances in both cases. See *Collazo v. State,* 623 S.W.2d 647 (Tex.Cr.App. 1981); see also *Collins v. State,* 577 S.W.2d 236 (Tex.Cr.App.1979); *Buckner v. State,* 571 S.W.2d 519 (Tex.Cr.App.1978) (on rehearing); *Ransom v. State,* 503 S.W.2d 810 (Tex.Cr.App.1974). The factors of remoteness and similarity are important, not in and of themselves, but only as they bear on the relevancy and probative value of the offered extraneous offenses. *Plante v. State,* 692 S.W.2d 487 (Tex.Cr.App.1985). In the case at bar, the "signature" is close to perfect. A similar and unique weapon with a barrel grooved with a "left-hand twist" was used in each shooting. The initial act of murder by means of multiple .38 caliber bullet wounds to the back of the head is the same. So too is the time of the killing, occurring late at night after the victim had retired for the evening and lay unguarded in sleep. The reason behind the murders appears to be the same, for pecuniary gain of which the actor would not otherwise be entitled.[5] Comparison of the coverup activity in both cases is also instructive. The bodies of both men were enshrouded in sleeping bags and buried in the yard around appellant's trailerhouse. Holes for the bodies had been previously excavated, ostensibly for a "bar-b-que pit" in the back yard and a "wishing-well planter" in the front yard. Innocuous-looking structures were placed over each gravesite and the yard was tended in a normal fashion by appellant. Taking all of the above facts into consideration, we find the State

---

5. Stegner testified that appellant told her she was going to kill Barker because Barker beat her, she "didn't want him around anymore", and she did not want to lose the trailerhouse which was in his name.

has shown the existence of sufficient common distinguishing characteristics between the extraneous and primary offenses to tip the balance in favor of admitting the extrinsic probative evidence going to the contested, material issue of identification. While admission of the evidence was inherently prejudicial due to the posture of the appellant, the same may be said of any such "signature" evidence which is probative of a crime for which a criminal defendant stands charged. Given the facts of the case before us, the fact that appellant raised an issue of identification during trial, and the high degree of similarity between offenses, the probative value of the extraneous evidence outweighs its prejudicial or inflammatory effect. See, e.g., *Moore v. State*, supra; *Plante*, supra; *Dickey v. State*, 646 S.W.2d 232 (Tex.Cr. App.1983); *Ransom*, supra. The evidence was properly admitted at trial. *Albrecht*, supra. Appellant's third point of error is overruled.

In three related points of error, appellant challenges the refusal of the trial court to grant the defense motion for change of venue. Appellant claims in her fifth point of error "it was clear from the evidence presented at the hearing of (sic) the motion that such a prejudice existed against the defendant in the community that a fair trial was precluded." Specifically, appellant argues that the trial court abused its discretion in refusing the motion since the State, after the defense had properly brought the motion and supported the motion with testimony, failed to "join the issue as there was no basis presented for its witnesses (sic) testimony but rather, bald assertions that a fair trial could be had."

The record reflects that appellant's counsel filed a pretrial motion for change of venue alleging appellant could not receive a fair trial in Henderson County due to "a dangerous combination" and "so great a prejudice" against appellant. The motion was supported by sworn compurgators Dardonelle Pickle and Linda Kraemer. See Art. 31.03, V.A.C.C.P. The State filed a controverting affidavit in accordance with Art. 31.04, V.A.C.C.P. The trial court held a hearing on the matter and witnesses for both parties testified. Eight witnesses were called by the defense and two were called by the State. Janice Yaklich, News Editor for the local newspaper, was the first witness called by the movant. Through her testimony counsel introduced into evidence stories and pictures from twelve daily editions of the local newspaper. The newswoman did not "know" if appellant could get a fair trial but could not think of any reason why appellant could not receive a fair trial in Henderson County. According to Yaklich, there was nothing in the articles which would prejudice or bias potential jurors. Having written most of stories herself, Yaklich testified that nothing in the stories indicated appellant was guilty of any offense, but simply said that she had been charged with the offense. She also stated that since the Beets story broke, there had been other, "larger" stories, and that it was the policy of the newspaper to cover all stories of local interest.

Evelyn Jobe also did not know whether appellant could get twelve fair jurors, but had not spoken to anyone who did think a fair hearing could be had. She could not serve as a fair and impartial juror but would not automatically vote on guilt. Her husband Thomas had the same opinion, testifying that if "people believes (sic) the paper," he did not think appellant could get a fair trial. But he also was unwilling to state that he would himself vote for the death penalty, saying that he "would have to hear all—some more testimony besides that paper." Nor did he know anyone else who would do so: he was "talking for (him)self" as far as finding twelve impartial jurors.

Ross Chambers, David Hilton, Bobby Miller and defense counsel's son Earl Andrews, Jr. were all of the opinion that neither they nor anyone else could be fair jurors. All four testified they had spoken with many people about the case, Chambers, Hilton and Miller indicating they would vote "guilty" even though the news stories only indicated appellant had been arrested and charged, but not convicted of the offense. Andrews also related how he

had discovered a story with accompanying sensational headline and photo on the cover of an edition of the *Weekly World News*, a tabloid sold at a local grocery store.

District Attorney Billy Bandy was the final witness called by the defense. Apparently called for the purpose of rebutting testimony as to the high profile of other criminal cases in relation to the instant case, Bandy to the contrary testified that other cases in which he had been involved had a higher profile.

The State called two witnesses at the hearing in response to the defense motion for venue change. Frank Sopuch was the affiant in the controverting affidavit filed by the State. Identified as the News Director for a local radio station, he testified as to the frequency of news reports regarding the discovery of the buried bodies, arrest of appellant and coverage of the case up to time of trial. He explained that a "major story" such as the Beets story would typically run in a spot in excess of thirty seconds. All stories initially put on the air would then be repeated five times within the following twenty-four hour period. In the instant case, stories were run three days in June, five days in July, two days in August and two days in September, for a total of sixty radio spots. Sopuch related that the news for the stories came from written information found in police reports, and stated that in his opinion, after talking with others, that there was not such widespread publicity so as to preclude appellant from receiving a fair trial. He had heard the case discussed at a local barber shop and at a cafe in Athens. When questioned whether he thought the news broadcast by rival stations would tend to bias listeners, Sopuch replied in the negative. In addition, he stated that he could be a fair and impartial juror in the case.

Gary Fulton was the last witness called. Fulton said he saw "no reason why (the jurors) couldn't be selected here." He did think that some of the stories were slanted: "[T]hey would say that—not necessarily that she was guilty but the fact that she was arrested as a suspect." Fulton could

not "give a guarantee" that appellant could receive a fair trial, rather "the job would fall upon the attorneys to select people that could be fair and impartial in their judgment." On final questioning by the State, he admitted reading Dallas and Tyler newspapers and having seen outside television accounts of the incident, and stated that he "couldn't guarantee" appellant could receive a fair trial anywhere.

After hearing the above described testimony, the trial court overruled the motion, stating, "The Court, after hearing the evidence, cannot say that there exists such a prejudice in this county that the Defendant is unlikely to obtain a fair and impartial Jury." Counsel's "exception" was duly noted by the court.

 The test to be applied in determining whether a venue motion should be granted is whether outside influences affecting the community climate of opinion as to a defendant are inherently suspect. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Faulder v. State*, 745 S.W.2d 327 (Tex.Cr.App.1987); *Phillips v. State*, 701 S.W.2d 875 (Tex.Cr. App.1985); *Nethery v. State*, 692 S.W.2d 686 (Tex.Cr.App.1985); *Banks v. State*, 643 S.W.2d 129 (Tex.Cr.App.1983). See also *Bell v. State*, 582 S.W.2d 800 (Tex.Cr.App. 1979). Absent a showing by the defendant that there exists such prejudice in the community that the likelihood of obtaining a fair trial by an impartial jury is doubtful, however, the discretion of the trial court to deny such a motion will not be disturbed on appeal. See *Phillips*, supra; *Nethery*, supra; *Ussery v. State*, 651 S.W.2d 767 (Tex. Cr.App.1983); *James v. State*, 546 S.W.2d 306 (Tex.Cr.App.1977).

 Within this context, the question whether to grant a defendant's request for a change of venue because of inflammatory or prejudicial publicity is one of constitutional dimension. *Phillips*, supra; *Bell*, supra. A change of venue is the remedy to jury prejudice resulting from widespread inflammatory news coverage and is available to assure an accused a fair trial when extensive news coverage has raised substantial doubts about obtaining

an impartial jury. *Phillips,* supra; *Henley v. State,* 576 S.W.2d 66 (Tex.Cr.App.1978). However, an applicant seeking a change of venue bears a heavy burden to prove the existence of such prejudice in the community that the likelihood of obtaining a fair and impartial trial is doubtful. *Nethery,* supra. When one seeks to have venue changed on the ground of adverse pretrial publicity, he must ordinarily demonstrate an actual, identifiable prejudice attributable to that publicity on the part of members of his jury. See *Faulder v. State,* supra.

Moreover, simply because a particular criminal case or offense is publicized in the media does not give rise to a prima facie claim of prejudice so that a defendant is entitled to a change of venue. See *Freeman v. State,* 556 S.W.2d 287 (Tex.Cr.App. 1977). As this Court has stated, "Clearly, . . . [the] standard does not require that jurors be totally ignorant of the facts and issues." *Eckert v. State,* 623 S.W.2d 359, 363 (Tex.Cr.App.1981). Rather, the publicity about the case must be pervasive, prejudicial and inflammatory. *Phillips,* supra; *McManus v. State,* supra; *Demouchette v. State,* 591 S.W.2d 488 (Tex.Cr.App.1979); *Bell,* supra.

█ Turning our attention to the case at bar, we disagree both with appellant's argument that the evidence presented at the pretrial hearing demonstrated such prejudice in the community existed as to prevent a fair and impartial trial, and with her hypothesis that the State "must bring some testimony with some basis to join issue" on the venue question. The issues are properly joined in the usual case where the State files an affidavit or affidavits controverting the defendant's initial pleadings requesting a change of venue. Where a controverting affidavit is not filed, the issue may still be joined, absent objection, by the State presenting testimony at a venue proceeding. In *Lundstrom v. State,* 742 S.W.2d 279 (Tex.Cr.App.1987), on the State's motion for rehearing, we adopted the dissenting opinion written by Judge Campbell on original submission wherein he effectively rebutted the then-majority opinion regarding the proper form of a controverting affidavit. On his way to concluding that a common-sense approach must be used in determining whether the State has met its procedural obligation to controvert a defendant's motion for change of venue, Judge Campbell set out the procedure this State has followed for one hundred years:

> What I glean from all of these old cases is that the burden is on a defendant to file his motion for change of venue with supporting affidavits, and that the State must then either default by filing nothing, see Durrough v. State, 562 S.W.2d 488 (Tex.Crim.App.1978), or *join issue by filing controverting affidavits to show that such prejudice does not exist.* It may successfully controvert by means of a general denial of the 'credibility' or 'means of knowledge' of the defendant's compurgators, or it may, as in the instant case, generally deny that there exists 'so great a prejudice against' the defendant or a 'dangerous combination against' the defendant so that 'he cannot expect a fair trial.' See generally, Art. 31.03, V.A.C.C.P.

*Id* at 286.

The proper procedure for joining issue with a motion for change of venue has been well settled for many decades. We therefore decline to reinterpret the applicable provisions of the venue statute.

█ We also cannot agree with appellant's claim that the evidence presented at the pretrial hearing clearly demonstrated that such community prejudice existed so as to preclude appellant her due process rights to a fair trial. Of the eight witnesses questioned by the defense, three people said they had a preconceived opinion as to guilt and punishment. Other witnesses stated they had a preconceived notion but could still follow instructions. At least one witness for each party was of the opinion that a fair trial could be had by appellant.

█ As earlier stated, the test of community prejudice does not require that jurors be totally ignorant of the facts and issues of a case. *Eckert,* supra. Common sense, as well as the dictates of a modern technological society must allow some lee-

way for the rapid dissemination of information to the public. Neither party to a lawsuit is served by restricting jury service to the uninformed or uninterested. As the Supreme Court has stated, "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed. 2d 751 (1961). Rather, the question to be asked is whether the publicity surrounding the case has permeated the community to such an extent that the prospective jurors' initial opinions cannot be set aside. In the matter of pretrial or trial publicity, we must therefore direct our attention to the exhibits allegedly creating the intolerable atmosphere of prejudice. See *Faulder*, supra; *Phillips*, supra; *Nethery*, supra; *Eckert*, supra.

We have carefully examined the exhibits and record testimony at the pretrial hearing but do not find therefrom that appellant's opportunity for a fair trial was caused to be "utterly corrupted by press coverage." See *Faulder*, supra, at 338, paraphrasing *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). The newspaper articles reflect fair and objective reporting. As several witnesses at the pretrial hearing admitted, the accounts factually cover the discovery of both bodies and the arrest of appellant, but do not speculate or factually assert facts as to the guilt of appellant. With one exception, the headlines of these articles are also factually objective. The one exception is found in the tabloid story entitled "Self–Made Widow." While such a headline may be obvious in its non-objective sensationalism, appellant never showed that the headline corrupted otherwise objective reporting. The record only reflects that the tabloid was purchased by counsel's son at a local grocery store. It was not shown that the tabloid was of local publication, nor was it proven in what quantities the tabloid had been sold in the area or to what extent the headline had "corrupted" future proceedings. We do note that the story itself is factually objective once one reads past the deceptive headline. We hold that appellant has failed to establish or demonstrate that

the trial setting was inherently prejudicial. *Faulder*, supra. Appellant's fifth point of error is overruled.

■■■ In her sixth point of error appellant contends that even if the trial court did not err in denying the motion for change of venue, "it was error for the trial court to conduct the voir dire in the manner that it did." Specifically, appellant complains of questions and instructions given by the trial judge to the prospective jurors wherein the judge (1) admonished the prospective jurors not to hold an opinion as to the guilt or innocence of the defendant but to "keep an open mind and fully consider the evidence" if chosen to be on the panel; (2) instructed the venire members not to read any newspaper accounts, listen to any radio accounts, watch any television accounts of the case or discuss the case with anyone, including other jurors; (3) questioned prospective juror Finley whether he had either heard or read about the case; and (4) questioned each prospective juror who had either heard or read something about the case whether he or she had reached a conclusion as to the guilt or innocence of the defendant. Appellant contends that the "end result of this procedure is that the venire men (sic) have been encouraged to conceal whether or not they have an opinion as to guilt or innocence." We do not agree.

A voir dire examination is for the purpose of enabling counsel to judge the demeanor of the panel and exercise the right to challenge or to peremptorily strike a prospective juror in an intelligent manner. See *Emanus v. State*, 526 S.W.2d 806 (Tex. Cr.App.1975). By statute, a trial judge is required to "propound to the entire panel of prospective jurors questions concerning the principals, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, *presumption of innocence, and opinion.*" Art. 35.17 V.A.C.C.P. (Emphasis supplied). Moreover, trial judges are not prohibited from intervening in examinations of a prospective juror; the court's discretion will be abused only when a judge's comments are reasonably calculated to benefit the State

or prejudice the defendant. See *Gardner v. State,* 733 S.W.2d 195 (Tex.Cr.App.1987). Here, contrary to what appellant contends, the questions and admonishments by the trial court were worded in such a manner as to expose, not conceal, animus or bias on the part of the prospective jurors. Appellant does not point to any specific problem encountered or any juror she was forced to accept who might have suffered from "concealed" bias. Our examination of the entire voir dire proceeding demonstrates that the trial judge acted in accordance with Art. 35.17, supra, and that the questions and instructions given the prospective jurors were proper both in scope and content. Appellant's sixth point of error is overruled.

In her seventh point of error, appellant contends the trial court erred in failing to grant a change of venue at the end of voir dire proceedings "as the evidence gleaned from the examination of the potential jurors further supported the claim of the defendant that a fair trial could be had in Henderson County." Appellant does not refer this Court to specific responses given by individual venirepersons or even to any particular pages in the record which "further" support her claim of a "corrupted" atmosphere. Therefore, nothing is presented for review. *Cuevas v. State,* 742 S.W.2d 331 (Tex.Cr.App.1987). However, given the severity of the charge and sentence imposed, we have examined the record and find no merit in appellant's claim. As stated *ante,* while it is true that the great majority of venirepersons acknowledged some familiarity with the case, we do not require or expect jurors who are wholly ignorant of the incident or the charge against a criminal defendant. *Eckert,* supra; *Adami v. State,* 524 S.W.2d 693 (Tex.Cr.App.1975). Again, the test is whether outside influences affecting the community's climate of opinion as to appellant are inherently suspect; was the climate of opinion "corrupted" so as to prevent appellant from receiving a fair and impartial trial? The articles at issue are "fair, accurate and designed for the purpose of informing the public of current events." *Phillips,* supra, citing *Bell,* supra, at 810 and cases cited therein. Even conceding that there might have been extensive knowledge in the community of either the crime or the appellant, or both, this is not sufficient by itself to render the trial constitutionally unfair. See *Faulder,* supra. We will not *presume* unfairness of constitutional magnitude solely on the basis that the community was made *aware* of the facts of the case and the fact that appellant was being charged with the crime. See *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); see also *Faulder,* supra. The record reflects that although the prospective jurors may have read or heard facts or details of the case, each either stated that he or she would try the case strictly on the evidence placed before them according to the instructions of the court, see *Phillips,* supra; see also *Von Byrd v. State,* 569 S.W.2d 883 (Tex.Cr.App.1978); *Adami,* supra; or in the case of the few veniremen who stated they had developed a firm opinion on guilt or innocence, each was successfully challenged and excused. Appellant has not shown that outside influences corrupted the community's climate of opinion nor has she shown that she was forced to take an objectionable juror. We are unconvinced that under the totality of circumstances she suffered a constitutional violation with respect to the pretrial publicity. *Faulder,* supra. See also *Henley v. State,* supra. The trial judge was within the limits of his discretion in denying the change of venue. *Phillips,* supra; *Nethery,* supra; *Ussery,* supra; *James v. State,* supra. Appellant's seventh point of error is overruled.

In her eighth point of error, appellant contends the trial court erred in failing to grant her motion for mistrial "after testimony revealed that the witnesses had been discussing their testimony with each other during trial." The defense brief points to a conversation between "accomplices" Robbie Branson and Shirley Stegner in the hallway outside the courtroom as proof of appellant's two children "comparing their testimony" during trial. Appellant additionally points out that Art. 36.06, V.A.C. C.P., authorizes the court to forbid witness-

es from discussing their testimony during pendancy of the case. The State responds by contending that the record does not support appellant's claim either that both witnesses are accomplices as a matter of law or that Branson and Stegner violated the rule against verbal intercourse by sworn witnesses.

As held *ante*, only Branson, not Stegner, is an accomplice as a matter of law. Nevertheless, both were sworn witnesses instructed by the trial court not to discuss the case or their testimony with any person other than trial counsel. See, generally, *Clayton v. State*, 652 S.W.2d 950 (Tex.Cr. App.1983). See also Art. 36.06, supra.

The record reflects that a hearing was held outside the jury's presence after both Branson and Stegner had testified. On direct examination by defense counsel, Branson stated that he did not "recollect" whether he had talked with his sister about his testimony the previous day, but that it "possibly could have happened." On cross examination he replied in the negative when asked if he had intentionally violated the trial court's order.

Stegner was then recalled and stated that neither she nor Robbie had talked about their testimony, but that she "was making comment (sic) about the paper" and "I heard something about you (defense attorney) accused him of killing Jimmy Don." Stegner denied that Branson had made the latter comment, saying "[W]e overheard comments." However, she also did not "exactly know" from whom she heard the comments. Further questioning revealed that she "understood I wasn't supposed to discuss the case but I didn't know I was not supposed to discuss anything that was in the paper." Stegner was adamant that she and her brother had not "talked face to face about anything." To clear up any misunderstanding, the trial court instructed both witnesses not to talk with anyone, including family members.

The next morning defense counsel moved for a mistrial, and in support of the motion called Henderson County Chief Constable Benny Moore to the stand. Moore said that he had been in the hall outside the courtroom and had observed a group of people, including Stegner and Branson, talking. Moore overheard Branson making the statement, "While I was on the stand, he asked ...," but the constable was unsure what Branson was speaking about, to whom he was addressing his comment, or the content of the remainder of the statement. The motion for mistrial was subsequently overruled.

It is undisputed that both witnesses were placed under the rule before trial began and were reminded of the court's instructions not to discuss the case or their testimony with others, or to read or listen to any such matters before being allowed to leave the stand. It is also clear from the testimony by Stegner and Branson at the hearing on appellant's motion for mistrial that both persons did engage in some conversation regarding the case or at least newspaper articles reporting the case. In any event, there is evidence that both witnesses violated the rule. That fact alone, however, does not require a trial court to automatically grant a motion for mistrial, nor is this Court constrained to hold such error reversible without more. While the rule should be complied with, not every violation is reversible error. *Hougham v. State*, 659 S.W.2d 410 (Tex.Cr.App.1983). Indeed, it is both useful and necessary to examine the reason or purpose for the rule and analyze the violation in context of the circumstances of the case.

The purpose of the rule is "to prevent corroboration, contradiction, and the influencing of witnesses." *Ex Parte Robertson*, 731 S.W.2d 564 (Tex.Cr.App.1987). The "influence" to be avoided is that between witnesses who testify subsequent to one another at trial. See *Cook v. State*, 30 Tex.App. 607, 18 S.W. 412 (1892).

In the instant case, appellant has failed to show how either Stegner or Branson thwarted the purpose for the rule or how she was harmed thereby. Both individuals had already testified and were not recalled for purposes of rebuttal or punishment. There was no evidence that either witness influenced the testimony of any other witness still waiting to be called to

testify. Although we are told that Branson directed his comment toward a "group" of people, the record is devoid of any evidence that any of those comprising the group were also to be called to testify. Nor is there a shred of evidence to support appellant's hypothesis on appeal regarding Stegner and Branson that "if these witnesses felt free to discuss this matter while under the rule, there is no limit as to what conspiratorial acts they may have committed before making their statements." Enforcement of the rule is within the sound discretion of the trial court and will not be disturbed absent a showing of abuse of that discretion or injury to the defendant. See *Green v. State*, 682 S.W.2d 271 (Tex. Crim.App.1984); *Hartsook v. State*, 244 S.W.2d 830 (Tex.Crim.App.1952). Given the facts of this case, we hold that the trial court properly exercised discretion in refusing to grant the motion as there is no evidence that appellant was injured by a witness's violation of the rule. See and compare *Archer v. State*, 703 S.W.2d 664 (Tex.Crim.App.1986). Appellant's eighth point of error is overruled.

█ In appellant's final point of error, she complains that the "prosecution's actions in subpoenaing approximately 90 witnesses while using only 20 deprived defendant of her right to effective counsel." As we interpret appellant's complaint, she is arguing that, because the State rested when it did, without calling each and every witness subpoenaed, she was forced to "spread the resources" to interview prospective witnesses and then was unfairly surprised, "preventing the defense from gathering and organizing its witnesses and argument." According to her brief on appeal, the effect here was to "say that the Defendant has no right to discover the names of the prosecution's witnesses." We do not agree.

It is worthy of note that appellant neither cites this Court to any specific page in the record nor provides any authority for the propositions outlined above. See *Cuevas*, supra. Moreover, our review of the record in this cause does not support the claims of ineffective assistance or denial of

due process allegedly caused by improper State action. First, the record shows that a mistrial was requested on the basis of the violation of the rule, discussed *ante*, and not on the basis now argued. Second, even if we were to interpret counsel's actual request, to wit, "Your Honor, based upon the testimony presented here yesterday, the testimony presented here today, we'll ask the Court to declare a mistrial" to include the specific claim now made, appellant has still failed to show why a mistrial should have been granted.

Upon proper motion to the court, witnesses should be disclosed to the defense if they will be used by the State at any stage of trial. See *Young v. State*, 547 S.W.2d 23 (Tex.Cr.App.1977). However, the State is generally *not* required to reveal names and addresses of witnesses *other* than those it intends to call to the stand. *Hendricks v. State*, 640 S.W.2d 932 (Tex.Cr. App.1982); see also *Young*, supra. And, while the better practice is for designation of all prospective witnesses who then later testify, it is within the discretion of the trial court to allow the testimony of a witness who has not been disclosed to the defense pursuant to discovery motion, subject to appellate review of the trial judge's exercise of that discretion. See *Hightower v. State*, 629 S.W.2d 920 (Tex.Crim.App. 1982); *Haynes v. State*, 627 S.W.2d 710 (Tex.Crim.App.1982); *Lincoln v. State*, 508 S.W.2d 635 (Tex.Crim.App.1974). A trial judge may also exercise discretion by limiting his order to certain witnesses, such as those to be called by the State during its case-in-chief. *Elkins v. State*, 543 S.W.2d 648 (Tex.Crim.App.1976); *Green v. State*, 510 S.W.2d 919 (Tex.Crim.App.1974).

The posture of the instant case is opposite that usually found in witness discovery situations. Appellant is not arguing that she was harmed by an undeclared witness's appearance or testimony, but that she suffered due to the State's action in providing *more* than the law requires. However, the record reflects that appellant's Motion for Discovery specifically requested "a list of all witnesses the State *plans to call*." (Emphasis supplied). The record also contains the prosecutor's reason for resting

his case when he did, that simply being because he felt the time was right. Finally, the record before us also documents the fact that defense counsel was to be given the time necessary before calling his first witness, and was assured that any or all of the witnesses under State subpoena who were not called by the State would remain available for the defense. Simply put, counsel requested and received the names and addresses of all witnesses the State may have wished to call in proving up a prima facie case against appellant. The State provided information potentially helpful to the defense. We will not judge by hindsight that which was done to accommodate the defense and to comply with the trial court's order.

Appellant would apparently have this court *require* the State to call and examine each prospective witness listed and disclosed through discovery, or strictly limit the ability and strategy of the State to prosecute a criminal case by requiring the prosecution, in some fashion, to limit the number of prospective witnesses who may be called to the witness stand. That we cannot and will not do. We have not in the past presumed to require the State to anticipate each and every defensive strategy, post a list of witnesses, then preclude any flexibility in the trial process by absolutely disqualifying any potential witness whose name is not initially placed on that list. As the late Judge Douglas wrote for this court in *Hoagland v. State*, 494 S.W.2d 186 (Tex. Crim.App.1973), "To require the State to anticipate any possible defense of an accused and to furnish names of all possible witnesses and have the court refuse to permit them to testify if their names were not listed would be to require an impractical and undue burden." *Id* at 188, 189. Similarly, the State should not be put to a higher burden where there is facial compliance with a valid trial court's order and where there is no evidence of bad faith on the part of the State in compiling the list of prospective witnesses or a showing how an

appellant was injured by the State action. Appellant's final point of error is overruled.

The judgment is affirmed.

WHITE, J., concurs in the result.

DUNCAN, Judge, concurring.

I think the majority opinion is absolutely correct in its analysis of V.T.C.A. Penal Code, § 19.03(a)(3). In addition to the syntactical conclusions advanced by the majority relative to the word "remuneration," I have another, albeit less esoteric, basis for concluding that V.T.C.A. Penal Code, 19.03(a)(3), is applicable to the facts of this case. The Texas murder for remuneration statute necessitates that the murder be committed for achieving a monetary gain. Admittedly, the usual scenario is when one hires another to kill. It seems to me, however, that it would be rather illogical to legislatively authorize the death penalty for one that hires another to kill, but exclude from that classification one that accepts the burden of killing for the purpose of gaining monetarily. In essence, the appellant simply hired herself to kill the deceased, assured in her own mind that she would monetarily benefit from her own conduct. Just because she elected to commit the murder herself, rather than depend upon another to do it, should not make her invulnerable to the death penalty. Now, she isn't.

CLINTON, Judge, dissenting.

I would be content to adhere to my concurring opinion on original submission in which three judges joined, but for an appallingly determined revisionist approach taken today: the writer of the lead opinion must reinterpret two previous opinions and disavow another—all of which he himself wrote—to come to a conclusion that is at odds with our opinions on original submission, as well as legislative history.

To determine just what the Legislature intended in § 19.03(a)(3), let us resort to legislative history of House Bill 200, Acts 1973, 63rd Leg., ch. 426, p. 1122.*

---

* For an overview, see Comment, *House Bill 200: The Legislative Attempt to Reinstate Capital Punishment in Texas,* 11 Houston L.Rev. (January

1974) 410 ("*Comment*"), but be aware that some references to pages in the Senate Journal are in

House Bill 200, as passed there, defined three capital offenses—for which the death penalty was *mandatory*. *Comment,* supra, at 417, n. 58 and accompanying text. Murder for hire was not one of them. *Ibid.*

When the bill reached the Senate Committee on Jurisprudence, leading senators put a different concept to work. Obviously influenced by related provisions of the Model Penal Code written by the American Law Institute (ALI), they drafted a complete committee substitute for House Bill 200.

While ALI did not take a position on the death penalty, it did insist that the capital sanction should be limited to murder and excluded for all other offenses, and that certain procedures govern its imposition. Model Penal Code and Commentaries, Part II, ALI (1980), at 3. It formulated a general definition of murder in § 201.2, at 13, and a scheme of aggravating and mitigating circumstances to be considered in determining the sentence in § 210.6, at 107. One aggravating circumstance is that murder was committed "for pecuniary gain." *Id.,* at 110.

The first part of what became § 19.03(a)(3) was crafted primarily by Senators Creighton and Meier, sponsors of the Committee Substitute attached hereto. Please notice that Section 1(B)(3) reads: "the person committed the murder for remuneration or the promise of remuneration"—nothing about employing another to kill. The remaining subsections follow ALI § 210.6; subsection (H) lists aggravating circumstances almost verbatim with § 210.6 (one ALI was omitted and item (7) was inserted), one of which is the murder was committed "for pecuniary gain."

The Senate Journal essentially reports motions and results of proceedings. With respect to such matters germane to House Bill 200 on May 23, 1973, see 2 Senate Journal (1973) (S.J.) 1440–1453 (not those pages cited in notes 62–66 of *Comment,* supra). However, the proceedings were taped and there is a transcription of that tape. Relevant portions will be interpolated with the Senate Journal.

Senator Ogg moved to bring up House Bill 200 out of regular order, S.J., at 1440; he stated that he had a version of the bill more like the House had passed, whereas Senator Meier was sponsoring one similar to the Committee Substitute, and they "would like to debate the two different philosophies." The motion passed and Senator Ogg opened the debate by explaining that whichever version was adopted would be worked into the proposed new penal code, and that both bills apply only to murder, including "if it is a *killing for hire.*" Compare (b)(2) of the Ogg amendment at S.J. 1441–1442—"the person committed the murder for remuneration or the promise of remuneration"—with Section 1(B)(3) of the Committee Substitute, *ante.* The main difference was that, like the House Bill, if the jury found defendant guilty Ogg would have the judge automatically assess the death penalty, and he argued that comported more with recent Supreme Court decisions. Pointing out that either version was sure to be tested again, he noted that one advantage to the Committee Substitute is that "it is basically like the Florida law, and the Florida law is already under attack in the federal court system." On motion by Senator Meier the Ogg proposal was tabled. S.J., at 1442. Thus the House version was interred.

Senator Meier then offered a comprehensive amendment in the nature of a substitute to the Committee Substitute. Retaining the basic concept and most provisions of the latter, it amended both article 1257, P.C. 1925 and Chapter 19 of the proposed penal code. Each included what senators were now calling the *"murder for hire"* provision, *viz:* (3) the person committed (or commits) the murder for remuneration or the promise of remuneration—still nothing about employing another to kill, S.J., at 1443—and in a new article 37.071 in the Code of Criminal Procedure were aggravating circumstances as in the Committee Substitute, e.g., that the murder was committed "for pecuniary gain," S.J., at 1445–1446.

error. See also legislative working materials appended hereto.

Senator Gammage argued that given the "murder for hire" classification there could be no moral justification for excluding the person who hired the killer. Senator Bracklein offered a floor amendment to address that argument, *viz:*

"(3) the person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration."

S.J., at 1449. Senator Bracklein briefly stated that his amendment makes "the punishment the same for the person responsible for the commission of the crime. And that is the person who instigated it ... that *hired the person who does the actual commission of the murder.*" Senator Meier further explained it, *viz:*

"[T]his amendment cures an objection that was raised earlier by Senator Gammage of Harris when he asked the question, well, if you have a *murder for hire* section ... for which the death penalty would be applicable, how can you morally justify excluding the person who is *doing the paying* in order to instigate the crime when you are subjecting the man who actually carries it out ... to the death penalty. Senator Bracklein's amendment merely places in a *murder for hire* classification the man ... or the woman who is doing the paying in *the same position* as a person who goes out and carries out the crime. I think it is a good amendment."

Being thus acceptable to Senator Meier, the amendment was adopted. S.J., at 1449.

Shortly the Meier Amendment was adopted and, as House Bill 200, was passed on third reading and sent back to the House. The House refused to concur in the Senate amendments and requested a conference; the joint conference committee produced "a hybrid of the original bill as passed by the House and the amended version as passed by the Senate." *Comment,* supra, at 418. In Table 1 there is set out a summary of each version along with the reconciliation by the conference committee. *Ibid.* Subdivision (3) remained intact. *Id.,* at n. 70. And, of course, the ALI and, e.g.,

Florida scheme of aggravating versus mitigating circumstances was abandoned—gone was the aggravating circumstances that murder was committed "for pecuniary gain."

From this legislative history the conclusion is inescapable that in context of subdivision (3) a person who "commits the murder for remuneration" must be hired by another to kill. The debate preceding the Bracklein amendment is couched by senators precisely in terms of "murder for hire," and no other. Both Senator Bracklein and Senator Meier made abundantly plain that his amendment was intended and designed to place the "hirer" in the same position as the "hiree." Using the term "remuneration" in the second clause is symmetrical with its use in the first.

That is the way Judge W.C. Davis and I read it in *Doty v. State,* 585 S.W.2d 726 (Tex.Cr.App.1979)—panel opinions to be sure, but they withstood State's motion for rehearing. So did the prosecutors who participated in preparing explanatory comments for Brancroft–Whitney in 1974, *viz:*

"The section [19.03] is intended to provide the possibility of punishment of death for the murder of certain individuals thought to be in special need of protection and in cases of *murder for hire....* Murder for hire is included because there appears to be a substantial probability that *those engaged in that occupation* pose a continuing and unacceptable threat to society."

2 Texas Annotated Penal Statutes (Branch's 3rd Ed.), § 19.03, p. 17. Those who write forms for indictment and jury charge do also. See, e.g., *Id.,* § 19.03, pp. 17 and 19; McCormick & Blackwell, Texas Criminal Forms and Trial Manual, 4.06, 7 Texas Practice 37, and § 93.06, 8 Texas Practice 412.

So did the Supreme Court in *Jurek v. State,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed. 2d 929 (1976), when it pointed out that the Texas statute requires the jury to determine, *inter alia,* "whether [the crime] was committed *for hire*[.]" *Id.,* at 270, S.Ct., at 2955. As Professor David Crump, himself an astute scholar and practitioner of the law on behalf of organizations dedicated to

strict enforcement, has written, "The statute provides that capital murder may be committed in one of five ways: .... (3) murder committed for 'remuneration' or hire[.]" Crump, *Capital Murder: The Issues in Texas*, 14 Houston L.Rev. (March 1977) 531, at 534.

For all those reasons, and many more not articulated but directed to other aspects of the lead opinion, I dissent first to extreme judicial revisionism in the face of clear legislative intent, and then to distortion of the law to overrule other points of error to the end that the sentence of death is upheld.

MILLER and CAMPBELL, JJ., joins in this opinion.

## APPENDIX

H. B. 200 By: Cobb

Committee on Criminal Jurisprudence

### BILL ANALYSIS

#### Background Information:

 A recent U. S. Supreme Court decision declared the Texas death penalty provisions unconstitutional, as presently written. It is felt that a statute prescribing mandatory penalties of death or life imprisonment for certain specified crimes would be in line with this decision and would withstand constitutional attack.

#### What the Bill Proposes to Do:

 To establish mandatory penalties of death or life imprisonment for certain specified crimes.

#### Section by Section Analysis:

Section 1. Amends Art. 1257, V.T.P.C., relating to the punishment for murder. The present article becomes Section (a) and death is deleted as a general punishment for murder. New Section (b) is added which prescribes death ~~or life imprisonment~~ as punishment for certain specific types of murder. ~~with malice aforethought.~~ New Section (c) provides that a defendant convicted of murder described in Section (b), above, shall be sentenced to death, ~~unless the jury recommends leniency, in which case he shall be sentenced to life imprisonment.~~ New Section (d) provides that if the jury fails to convict under Section (b), it may nevertheless convict for murder ~~with or without malice,~~ under Section (a), above, or for any lesser included offense. ~~Section (e) provides that when a violation of Section (b) is charged prospective jurors must be so informed and no one may serve as a juror unless he states under oath that this will not affect his deliberations or questions of fact.~~ Section (e) contains definitions.

Sec. 2. Severability Clause.

Sec. 3. ~~Emergency Clause.~~ *Amends Art. 44.23, V.T.C.C.P., which provides for the time when appeals shall be determined. The amended version would add new language giving appeals in the death priority to those appeals in which the death penalty has been assessed.*

*Sec. 4, Emergency Clause.*

H.B. No. 200

By: Cobb, Lombardino, et al

(In the Senate—Received from the House May 11, 1973; May 11, 1973, read first time and referred to Committee on Jurisprudence; May 18, 1973, *reported adversely, with favorable Committee Substitute; May 18, 1973, sent to the printer.*)

COMMITTEE SUBSTITUTE FOR H.B. NO. 200

By: Creighton, Meier

A BILL TO BE ENTITLED

AN ACT

relating to the punishment for murder under certain circumstances and conditions; repealing Article 1257, Penal Code of Texas, 1925, as amended; and declaring an emergency.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

"Section 1. Punishment for murder

"(A) Except as provided in Subsection (b) of this Article, the punishment for murder shall be confinement in the penitentiary for life or for any term of years not less than two.

"(B) The punishment for murder with malice aforethought shall be death or imprisonment for life if:

"(1) the person murdered a peace officer or fireman who was acting in the lawful discharge of an official duty and who the defendant knew was a peace officer or fireman;

"(2) the person intentionally committed the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, forcible rape, or arson;

"(3) the person committed the murder for remuneration or the promise of remuneration;

"(4) the person committed the murder while escaping or attempting to escape from a penal institution;

"(5) the person, while incarcerated in a penal institution, murdered another who was employed in the operation of the penal institution;

"(C) In all cases prosecuted pursuant to this section, the procedure set out herein shall be followed in order to determine sentence of death or life imprisonment.

"(D) Upon conviction or adjudication of guilt of a defendant under section (B) of this Article, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment. The proceeding shall be conducted in the trial court before the trial jury, unless waived, as soon as practicable. If the trial jury has been waived or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury empaneled for that purpose unless waived by the defendant. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (H) and (I) of this section. Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements; and further provided that this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.

"(E) After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court based upon the following matters:

"(1) whether sufficient aggravating circumstances exist as enumerated in subsection (H), and

"(2) whether sufficient mitigating circumstances exist as enumerated in subsection (I), which outweigh aggravating circumstances found to exist, and

"(3) based on these considerations whether the defendant should be sentenced to life or death.

"(F) Notwithstanding the recommendation of the jury, the court after weighing the aggravating and mitigating circumstances shall enter a sentence of life imprisonment or death, but if the court imposes a sentence of death, it shall set forth in writing its findings upon which the sentence of death is based as to the facts:

"(1) that sufficient aggravating circumstances exist as enumerated in Subsection (H), and

"(2) that there are insufficient mitigating circumstances, as enumerated in Subsection (I), to outweigh the aggravating circumstances. In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact based upon the circumstances in Subsections (H) and (I) and based upon the records of the trial and the sentencing proceedings.

"(G) If the court does not make the findings requiring the death sentence, the court shall impose sentence of life imprisonment.

"(H) Aggravating circumstances—Aggravating circumstances shall be limited to the following:

"(1) the murder was committed by a person under sentence of imprisonment;

"(2) the defendant was previously convicted of another murder or of a felony involving the use or threat of violence to the person;

"(3) the defendant knowingly created a great risk of death to many persons;

"(4) the murder was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit any kidnapping, burglary, robbery, forcible rape, or arson;

"(5) the murder was committed for the purposes of avoiding or preventing a lawful arrest or effecting an escape from custody;

"(6) the murder was committed for pecuniary gain;

"(7) the murder was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

"(8) the murder was especially heinous, atrocious or cruel.

"(I) Mitigating circumstances—Mitigating circumstances shall be the following:

"(1) the defendant has no significant history of prior criminal activity;

"(2) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

"(3) the victim was a participant in the defendant's conduct or consented to the act;

"(4) the defendant was an accomplice in the murder committed by another person and his participation was relatively minor;

"(5) the defendant acted under extreme duress or under the substantial domination of another person;

"(6) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;

"(7) the age of the defendant at the time of the crime.

"(J) If the jury does not find beyond a reasonable doubt that the murder was committed under one of the circumstances or conditions enumerated in Subsection (B) of this Article, the defendant may be convicted of murder, with or without malice, under Subsection (A) of this Article or of any other lesser included offense.

"(K) If one of the circumstances or conditions enumerated in Subsection (B) of this Article is charged in an indictment, the prospective jurors shall be informed that a sentence of either death or imprisonment for life is mandatory on conviction for the offense charged. No person is qualified to serve as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact.

"(L) In this Article:

"(1) 'penal institution' means an institution operated by or under the supervision of the Texas Department of Corrections or a city, county, or regional jail.

"(2) 'peace officer' means a person defined as such by Article 2.12, Code of Criminal Procedure, 1965, as amended.

"(3) 'fireman' means a person employed or engaged by the state or a county, city, municipality, or public subdivision in connection with the fighting or extinguishing of fires.

"(M) The judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals of Texas within sixty (60) days after certification by the sentencing court of the entire record unless time is extended an additional period not to exceed thirty (30) days by the Court of Criminal Appeals for good cause shown. Such review by the Court of Criminal Appeals shall have priority over all other cases, and shall be heard in accordance with rules promulgated by the Court of Criminal Appeals."

Sec. 1. Article 1257 of Section 1, Chapter 274, Acts of the 40th Legislature, Regular Session, 1927, as amended (Article 1257, Vernon's Texas Penal Code), is repealed.

Sec. 2. Severability Clause. If any provision of this Act or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are declared to be severable.

Sec. 3. Emergency Clause. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and that this Act take effect and be in froce [sic] from and after its passage, and it is so enacted.

\*　　\*　　\*　　\*　　\*　　\*

Austin, Texas

May 18, 1973

Hon. William P. Hobby

President of the Senate

Sir:

We, your Committee on Jurisprudence, to which was referred H.B. No. 200, have had the same under consideration, and I am instructed to report it back to the Senate with the recommendation that it do pass and be printed.

Herring, Chairman

ANALYSIS OF CONFERENCE COMMITTEE REPORT H.B. NO. 200

Because the structure of H.B. No. 200, as it passed the House and as it passed the Senate is not parallel, a section-by-section analysis is not possible. The following compares the differences in the Senate and House versions and shows how the Conference Committee Report adjusts these differences.

| Senate | Conference Committee | House |
|---|---|---|
| 1. Provides for death penalty or life imprisonment | Adopted Senate version | Provides for death penalty only |
| 2. Applies to person who hires murderer | Adopted Senate version | Not covered |
| 3. Applies to murders by bombs | Adopted House version | Not covered |
| 4. Definition of fireman | Adopted House version | Fireman not defined |
| 5. Includes Texas Youth Council in definition of penal institution | Adopted House version | Youth Council not included |
| 6. Provision to incorporate death penalty into new Penal Code | Adopted Senate version | Not covered |
| 7. Amended Code of Criminal Procedure to abolish notice of intent to seek death | Adopted Senate version | Not covered |

| Senate | Conference Committee | House |
|---|---|---|
| 8. Amended Code of Criminal Procedure to permit waiver of jury in capital case | Adopted House version | Not covered |
| 9. Amended Code of Criminal Procedure to provide standards for jury consideration of penalty | Reduced number of standards from Senate version | Death mandatory |
| 10. Provided advisory jury verdict on penalty; judge assessment | Death or life depends on jury's answers to issues | Not covered; death automatic if guilty |
| 11. Effective date provision: amendment to existing Penal Code effective until new Penal Code takes effect; then expires and amendment to new Penal Code applies | Adopted Senate version | Not covered |

TEAGUE, Judge, dissenting.

This case illustrates the futility of statutory construction in what seems to me a particularly gripping way. Today we decide on rehearing that Betty Lou Beets, a murderess, may be put to death by the State of Texas. On original submission, not long ago, a majority of this Court held otherwise. The difference between then and now is absolutely nothing more than the protean opinion of a few judges regarding the meaning of an English word—"remuneration." Relatively harmless and insignificant in itself, this word and the sense in which our Legislature meant to use it, is the thread by which Betty Lou Beets's life hangs.

I don't mean to be maudlin about this. Ms. Beets is evidently a greedy and insensitive killer, the kind of succubus who has managed to capture the romantic imagination of Americans in such modern cinematic classics as "Body Heat" and "Black Widow." I have little sympathy for her, nor would it alarm me overly much if the Legislature had decided that all such criminals should be put to death. What I have difficulty believing is that the Legislature has already decided this in fact.

We have a statute that makes eligible for the death penalty any person who commits "murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration." Penal Code, § 19.03(a)(3). We know for certain that the Legislature intended this law to catch professional hit men and those who hire them. We know this because pertinent legislative reference materials, including audio recordings of committee hearings concerning the statute, invariably refer to it as the "murder-for-hire" section. In fact, these sources always and only refer to it in this language. None of them ever suggest, even in the most attenuated way, that any individual senator or representative, let alone the Legislature as a whole, had it in mind to proscribe anything but professional assassination. Thus, the question whether it does proscribe anything else in fact is somewhat more difficult than might at first appear. And it doesn't get any easier.

The Texas Penal Code, into which this statute has been codified, admonishes the courts to construe its provisions, not "strictly," but "according to the fair import of their terms, to promote justice and effect the objectives of the code." Penal Code, § 1.05(a). No one is likely to quarrel with ideological generalities this popular, but they aren't especially helpful as tools of statutory construction. We are also advised that much of the Code Construction Act (Chapter 311 of the Government Code) applies to interpretation of the Penal Code. Penal Code, § 1.05(b). A brief look at pertinent sections of the former is, therefore, in order.

According to the Act, "[w]ords and phrases shall be read in context and construed according to rules of grammar and common usage." Government Code, § 311.011. Courts, in construing statutes, are also permitted to consider, among other things, the "(1) object sought to be attained; (2) circumstances under which the statute was enacted; (3) legislative history; (4) common law or former statutory provisions, including laws on the same or similar subjects; (5) consequences of a particular construction; (6) administrative construction of the statute; and (7) title (caption), preamble, and emergency provision." Government Code, § 311.023. Nothing else in the Code Construction Act seems even remotely pertinent to the present inquiry.

As observed previously, we haven't a clue whether the Legislature intended "murder for remuneration" to denote more than professional assassination. And to its credit the majority doesn't even pretend to know what the Legislature meant. The statute was enacted during the rush to reestablish capital punishment in Texas after the Supreme Court of the United States declared it unconstitutional in 1972. It was one of five sections designed to narrow the class of death-eligible murderers. No other specific objective is apparent on the statute's face or from a review of its sketchy legislative history. The prior law of homicide in Texas did not include provisions relating to remuneration. Neither, apparently, did the common law of England. Consequently, there being no other promising basis upon which to determine the meaning of "remunerate," we are more or less obliged to leave it up to the lexicographers at Merriam–Webster.

I suppose this is as it should be. After all, we must look for "common usage," and Webster's Third New International Dictionary is one of the most reliable sources on this subject. I, therefore, accept that, in common usage, the word "remunerate" means "to pay an equivalent to (a person) for a service, loss or expense." What is inconceivable to me is the majority's conclusion in this case that, under Penal Code, § 19.03(a)(3), "the import of remuneration is one paid for a loss or suffering." On the contrary, the Penal Code says nothing about paying, compensating, or remunerating anyone for a loss or a suffering. Under our law, the clearly expressed import of "remuneration" is, to paraphrase the majority, one paid for a murder.

Obviously, murder is death, death is a loss of life, and loss of life typically causes some suffering. But these trivial truths do not authorize the conclusion that a payment for the loss of life is tantamount to a payment for murder. Surely a professional hit man does not expect to receive payment for services rendered if his mark is struck by lightning. He only gets remunerated for killing, not merely for the death of his intended victim. Similarly, insurance companies pay death benefits for the loss of life; they don't remunerate murder. Ms. Beets may have hoped or even expected to receive payment for the death of her husband, but it surely strains the possibilities of ordinary English to say that she expected to be remunerated for murdering him. In my view, the context of § 19.03(a)(3), if not its plain language and grammatical structure, compels a conclusion that the remuneration contemplated by our law is the payment of an equivalent to a person *for murder.*

Having said that, perhaps it is best not to belabor the point. Arguments about language and the meaning of words tend to go on forever. Although some stylists are more sensitive to the richness of our language than are others, the touchstone in legal construction should always be some common denominator of speech, that which is most comprehensible to the greatest number. Subtle differences between "remunerate," "compensate," "recompense," "pay," and a host of other words that do much the same work in English are less important than the sense in which ordinary speakers reasonably intend their words to be understood. Because, in the case of our present dilemma, we don't know and can't find out what the Legislature actually meant, our best recourse is to estimate what an average speaker of English might mean by "murder for remuneration or the

promise of remuneration" in the context of ordinary discourse. Again, however, we are hopelessly divided on the question. The majority would understand such speech "as inclusive of a murder for gain or profit, where the actor's unilateral conduct results in the death of the victim." Slip Opinion, p. 722. A significant minority, including myself, would not understand it in this way.

Consequently, let me concede for a moment that the statutory language is, indeed, susceptible of the reading given it by a majority of this Court. After all, my brethren are all competent speakers of the English language. I assume, likewise, they are willing to acknowledge, at least for purposes of argument, that those who disagree with them upon this question also include competent speakers of English. The inescapable conclusion is that the language of the statute itself, even when construed according to common usage and read in context, is vague. It means somewhat different things to different people. Under such circumstances, some additional considerations bear heavily upon this Court's task of statutory construction.

First, it is the express purpose of our Penal Code, as it must be for any penal statute, "to give fair warning of what is prohibited and of the consequences of violation". Penal Code, § 1.02(2). Almost half the judges on this Court, and more than half at various times in the past, would not report, on reading the statutory language, that the conduct for which Ms. Beets was convicted in this cause is a capital offense. I have serious doubts whether it can be said that a law provides fair notice of its import when nearly fifty percent of even the most sophisticated readers wouldn't have understood it in the way it is now being construed.

Second, the consequence of construing this statute as broadly as the majority does in this cause is to greatly expand the class of death-eligible murderers under circumstances where it isn't clear that the Legislature intended such a result. Indeed, the new category of "murder for gain or profit" is, if anything, even more uncertain in

scope than the statutory language being construed. To hypothesize only a single example, I am now inclined to believe from the "fair warning" given by the majority opinion in this cause that a person who murders a business competitor or rival for employment has committed a capital offense. I fear there may be many other equally disturbing categories of "murder for remuneration," as yet undreamed of, that the Legislature never meant to punish with death.

I don't mean to suggest that legislative intent should be the last or most important consideration in statutory construction. The fact that our Legislature's specific purpose is almost always inaccessible to this Court and to nearly everyone else in Texas largely disqualifies it as a meaningful criterion anyway. But when there is serious doubt about the scope of a penal law, the fairness of its notice to the public, or substantial disagreement about the meaning of its terms, broad construction is, in my view, ill advised. This is especially so in the case of our death penalty laws. I suppose what bothers me the most in this cause is that a majority of this Court, knowing there to be substantial disagreement about the meaning of "remuneration" and about the statute in which it appears, has taken the attitude that "when in doubt, kill." I had always thought that sound statutory construction and good judicial sense required exactly the opposite result.

Therefore, I respectfully dissent, but this singular dissent should not be interpreted to mean that I agree with the remainder of the majority opinion.

### FROM DENIAL OF APPELLANT'S MOTION FOR REHEARING

Appellant's motion for rehearing has been denied by this Court without written opinion. I dissent to this action for two reasons. The first is expressed in my dissenting opinion on the State's motion for rehearing and will not, therefore, be repeated here. The second concerns appellant's claim that evidence of an extraneous offense was improperly admitted at trial. She maintains that this Court erroneously

overruled her third point of error on rehearing, and I now agree.

Two of appellant's former husbands were found buried in her yard. Both had been shot through the head with a .38 caliber weapon, evidently while asleep, and both were interred in sleeping bags. For these and other reasons, the murders seem to have been the handiwork of a single person or of the same group of persons. In the instant cause, appellant was prosecuted only for the murder of her second husband. However, the State was permitted over objection to offer evidence that her first husband had also been murdered and buried in the yard.

The State contends that this evidence was admissible to show a common scheme or design and to rebut a defensive issue relating to identification of the killer. The jury was instructed, however, to consider the evidence only for the latter purpose of determining the murderer's identity. A majority of this Court concluded that cross-examination of Robbie Branson by counsel for the defense suggested to the jury that Branson, and not the appellant, committed the murder for which appellant was charged in this cause. Further, the majority held that other evidence offered by the appellant at trial intimated that Branson "had an equal or superior opportunity, motive and criminal background to commit the deed as did appellant[.]" I do not disagree with these conclusions.

However, this only begins the inquiry. We know at this point that there was legitimately before the jury for consideration the question whether the deceased in this cause was killed by the appellant or by Robbie Branson. To be admissible, therefore, the evidence here at issue must be relevant to this question. By "relevant" we mean, of course, that the evidence must tend to make more probable or less probable than it would be without the evidence that appellant, and not Branson, killed appellant's second husband. And it is at this point that I part company with the majority opinion.

Here, the Court simply concludes without additional argument that:

Identity being both a material and disputed issue in the case, we find that the circumstantial evidence regarding the killing of Barker [appellant's first husband] made it more probable than not the appellant was the triggerperson in the instant offense and, as such, it was relevant.

p. 725.

This is an incredible leap. The majority tells us neither what this circumstantial evidence is nor, more particularly, how it renders more probable the proposition that appellant, and not Branson, committed the murder. Taking a few moments actually to do the indicated analysis discloses the inferential flaw in the majority opinion.

The syllogism expressing logical relevancy in this context is as follows:

(1) Person X committed offense $O_1$, where $O_1$ is the extraneous offense;

(2) Offense $O_1$ was committed by the same person who committed $O_2$, where $O_2$ is the charged offense;

(3) Therefore, person X committed offense $O_2$.

If premises (1) and (2) are true, but only if they are both true, conclusion (3) follows as a matter of logical inference. Therefore, proof of the extraneous offense will be relevant to whether the accused committed the charged offense only if evidence is offered to support, as an empirical matter, the truth of both premises. Consequently, before proof of the extraneous offense may lawfully be admitted over objection, there must be evidence in the record from which it can rationally be inferred that the accused did, in fact, commit the extraneous offense and that such offense was committed by the same person who committed the charged offense.

We have held that the second premise is established well enough for purposes of relevancy when it is shown that the two crimes are, on balance, grossly similar and not remotely separated in time or place. As noted previously, there is adequate proof of this premise in the instant cause. We have also held that the first premise must be established by clear and convinc-

ing evidence of the accused's culpability. To be more precise, evidence of the accused's culpability as to the extraneous offense must generally be better than the evidence showing his culpability of the charged offense. Otherwise, evidence of the extraneous offense is merely redundant on the question of identity.

In the instant cause, I can find nothing in the record to indicate a greater likelihood that the extraneous offense was committed by appellant than that it was committed by Branson. Such evidence might consist of independent proof tending to show either that appellant committed the extraneous offense or that Branson did not. For example, had it been shown that Branson was too young to have committed the extraneous offense, or that he had been living elsewhere when it was committed, such evidence would render it more likely that, as between appellant and Branson, the former committed the extraneous offense, and therefore the charged offense as well. But without some such evidence, it is no more likely that appellant, and not Branson, committed the extraneous offense than it is that appellant, and not Branson, committed the charged offense.

To put the matter a little differently, given the majority's rationale in this case, had the State elected to prosecute Branson for the murder, it surely would have been permitted by this Court to offer the extraneous offense against him for exactly the same purpose as it was offered against appellant. This circumstance alone should convince beyond any question that the extraneous murder simply did not render it more or less probable than it would be without the evidence that either appellant or Branson committed the murder. In short, it did not help at all to resolve the question of who did it because there was no better evidence or inference to support the premise that appellant, and not Branson, committed the extraneous murder. Consequently, proof of the latter was merely redundant on the issue of identity, and thus had no independent relevance in the instant cause.

Once again, this Court has managed to provide bench and bar with an ostensibly authoritative opinion concerning the law of extraneous offenses which effectively eviscerates the erstwhile requirement that such evidence be relevant to a material issue in the case. It astonishes me that so little thought goes into articulating the precise manner in which such evidence bears upon the legitimate issues of a case, and that so much wind passes in the process. The majority cannot cogently demonstrate in the instant cause that evidence concerning the murder of appellant's first husband contributed in any meaningful way to proof that she, and not Robbie Branson, murdered her second husband. Accordingly, it was not relevant and should have been excluded.

For these reasons, and for the reasons expressed in my dissenting opinion of the State's motion for rehearing, I dissent to the denial without written opinion of appellant's motion for rehearing in this cause.